522 A.2d 1058

COMMONWEALTH of Pennsylvania, Appellee,

v.

Raymond WILLIAMS, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 15, 1986.

Decided March 17, 1987.

64

---

Kurt S. Rishor (Court-appointed), Butler, for appellant.

David L. Cook, Dist. Atty., David A. Hepting, Asst. Dist. Atty., Robert F. Hawk, Asst. Dist. Atty., Butler, for appel-lee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is a direct appeal from imposition of judgment of sentence of death, 42 Pa.C.S.A. §§ 722(4), 9711(h). For the reasons that follow, we will not disturb the convictions, but we reverse the judgment of sentence of death and remand for imposition of a life sentence.

Appellant was convicted along with his brother, Ronald Alfred Williams, of murder of the first degree, criminal conspiracy, possession of instruments of crime, prohibited offensive weapons, receiving stolen property, and firearms not to be carried without a license in connection with the shooting death of Archie Bradley in Cranberry Township, Butler County.

■ On August 5, 1984, at approximately 10:15 p.m., Archie Bradley arrived at his place of employment, a truck stop in Cranberry Township. At that time, a truck driver who had been watching television in the sleeper section of his tractor-trailer rig, which was located in the parking lot of the truck stop, heard some gun shots that sounded as though they had come from a pellet gun or air rifle. The truck driver looked out his window and saw a man standing in the fairly well-illuminated lot. The man was at a distance of approximately thirty feet, and was holding what appeared to be a gun or rifle (a weapon larger than a handgun), and the body of Archie Bradley was lying on the ground. The man then began to run across the parking lot towards Route 19. Based upon this brief but ample opportunity to view the man, the truck driver positively identified appellant, at a police line-up and at trial, as the man he had seen in the truck stop parking lot.

Bradley was pronounced dead on arrival at a hospital following the shooting. He had been shot five times at

close range with a .45 caliber weapon, and the wounds displayed a fanlike trajectory that indicated the shots had been fired from an automatic weapon. Eleven spent .45 caliber shell casings were later found at the crime scene.

Just after the shooting occurred, a police officer was driving on Route 19, at approximately 10:30 p.m., when he saw an Oldsmobile pull out of the truck stop. The Oldsmobile did not have its lights on, and its wheels were throwing gravel, so the officer commenced to follow the vehicle. Another motorist who was traveling on Route 19 at the time noticed that the Oldsmobile was being followed by the police car, and, while stopped at a red light, the motorist looked into the Oldsmobile while it was along side of his car. Later, in court, the motorist positively identified the driver of the Oldsmobile as appellant's brother and co-defendant, Ronald Williams.

After the motorist observed the Oldsmobile at the red light, a high speed police chase ensued in which the pursuing officer saw several objects being thrown from the Oldsmobile. The objects were later recovered by police investigators and were found to consist of a .45 caliber automatic weapon known as a "Mac–10" machine pistol, a Mac–10 ammunition clip, and a noise suppressor/silencer. Ballistics experts established that the Mac–10 machine pistol had inflicted the fatal wounds upon Bradley.

During pursuit of the Oldsmobile, the police officer briefly lost sight of the vehicle as it approached a police road-block, but, upon backtracking, the officer found the vehicle abandoned and wrecked in a field. A search of the vehicle revealed .45 caliber ammunition, an attache case, .22 caliber weapons and ammunition, driver's licenses belonging to appellant and his brother, and an owner's registration card listing appellant's brother as the owner of the Oldsmobile. In addition, there was found in the vehicle a piece of paper upon which was written the name of the truck stop where the shooting had occurred, and, beside that name was the notation, "10:15."

Police radio bulletins were issued for the apprehension of appellant and his brother, and, early in the morning of the day following the shooting, both were captured by police officers in a neighboring township. At the time of capture, neither appellant nor his brother was carrying any identification. Appellant's brother was captured while walking along a street, and appellant, in a sweaty and exhausted condition, was found lying in a garden.

At trial, a resident of Detroit, Michigan identified the Mac–10 gun, and the attache case found in the Oldsmobile, as having been stolen from his car in Detroit. He further testified that, at the time of that theft, the Mac–10 gun was not equipped with a noise suppressor/silencer.

That the conviction is fully justified by the evidence is not denied. In fact, counsel for appellant admitted at the sentencing stage of the proceedings that the evidence of guilt was overwhelming. Nevertheless, in keeping with our determination to assess, in every case, the sufficiency of the evidence, *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26, n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d. 1237 (1983), *reh'g. denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983), we have done so, and hold the evidence to be sufficient to sustain the convictions.

■ Appellant argues that the trial court abused its discretion in refusing to grant his request for appointment of new counsel on the eve of trial. Voir dire was scheduled to commence on January 17, 1985. By letter dated January 14, 1985, appellant requested the trial court to relieve his court-appointed counsel of any further duties in his matter for the reason that he felt he would "not get proper representation from Mr. Goldfinger." Counsel joined in the request, stating, "[Appellant] can't apparently enjoy, or we wouldn't be able to enjoy any kind of cooperation, perhaps, between counsel and client which *could* ultimately cause problems for his defense." Counsel added, without supplying details, that appellant had filed suit against him in federal court. The court refused appellant's request on

grounds appellant failed to state "substantial reasons" why new counsel should be appointed.

Whether a petition for change of court-appointed counsel should be granted is within the sound discretion of the trial court, *Commonwealth v. Segers*, 460 Pa. 149, 154, 331 A.2d 462, 465 (1975). Pa.R.Crim.P. 316(c) provides for appointment of counsel "whenever the interests of justice require it." That Rule further provides as follows:

(ii) A motion for change of counsel by a defendant to whom counsel has been assigned, shall not be granted except for substantial reasons.

In view of appellant's failure to supply any reasons, much less substantial ones, why new counsel should be appointed, the trial court's refusal of that request was not an abuse of discretion.

■ Appellant makes several arguments regarding voir dire. First, appellant argues that "the trial court erred in forcing him to exhaust his peremptory challenges on veniremen who should have been excused for cause." Appellant challenged for cause four veniremen who stated their beliefs that, in effect, persons charged with crimes were probably guilty and, if innocent, ought to produce some evidence of innocence. Appellant claims these veniremen possessed a bias or prejudice that colored their ability to remain impartial.

It is not expected and the law does not require that jurors be free from *all* prejudice. Such a standard would be impossible to meet. Rather, "the test of disqualification is the juror's ability and willingness to eliminate the influence of his scruples and render a verdict according to the evidence, and this is to be determined by the discretion of the trial judge, based upon the juror's answers and demeanor.... Nothing short of a palpable abuse of discretion justifies a reversal in passing on a challenge for cause...." *Commonwealth v. Bighum*, 452 Pa. 554, 560, 307 A.2d 255, 259 (1973), quoting *Commonwealth v. Gelfi*, 282 Pa. 434, 437–8, 128 A. 77, 79 (1925) (Citations omitted). See also *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751

(1961). "Even a statement by a juror that some evidence would be required to change an impression already formed by him would not be grounds for challenge for cause if he likewise said that he would be guided by the evidence," *Commonwealth v. McGrew*, 375 Pa. 518, 526, 100 A.2d 467, 471 (1953).

Applying these standards and reviewing the *entire* voir dire examination of the challenged veniremen, we find no error in the court's refusal to excuse these veniremen for cause. In addition to making the statements appellant finds objectionable, in response to questioning by the court, each venireman also expressed understanding that the accused had no burden of proof, was not required to give evidence, and was to be considered innocent until the Commonwealth proved its case beyond a reasonable doubt. "[A]s the examination was in the presence and under the control of the trial judge, he had better opportunity for discovering the nature and strength of the alleged disqualifying opinion than a printed report of the juror's testimony affords." *Commonwealth v. Crossmire*, 156 Pa. 304, 309, 27 A. 40, 41 (1893). There being no support on this record for a finding of a "palpable abuse of discretion," we will not disturb the trial judge's ruling.

■ Appellant also argues that two veniremen were improperly excused for cause on a basis broader than that permitted by *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Quoting *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), *Wainwright* reiterates:

> [T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

469 U.S. at 423–26, 105 S.Ct. at 851–53, 83 L.Ed.2d at 851–852. Appellant argues that, as two veniremen indicated an ability to impose the death penalty despite their

personal opposition to it, their exclusion for cause was error. However, in each case, appellant has read the comments of the veniremen out of context. Prior to making the comments quoted and relied upon by appellant, both veniremen stated that they were "irrevocably committed to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the trial." In addition, after the expression of willingness to apply the death penalty upon which appellant relies, the veniremen reiterated their earlier stated inability to apply the death penalty in an appropriate case. Under the circumstances, we must defer to the judgment of the trial judge who saw and heard the veniremen.

Appellant argues that exclusion of veniremen who would automatically vote against imposition of the death penalty produced a "prosecution prone" jury and thus denied him his rights to an impartial jury drawn from a fair cross-section of the community under the Sixth and Fourteenth Amendments to the United States Constitution. The Supreme Court of the United States recently rejected the argument that the Constitution of the United States prohibits states from "death-qualifying" juries, stating:

> The limited scope of the fair cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly "representative" petit jury.... "The point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn".... [A]n extension of the fair cross-section requirement to petit juries would be unworkable and unsound, and we decline McCree's invitation to adopt such an extension.

> . . . . .

> "Death qualification," unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the

case at both the guilt and sentencing phases of a capital trial.

. . . . .

"Witherspoon-excludables" or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement.

*Lockhart v. McCree*, 476 U.S. 162, —, 106 S.Ct. 1758, 1764–66, 90 L.Ed.2d 137, 148–150 (1986). (Citations omitted.) Thus, appellant's argument is unavailing.

 Appellant argues the Juvenile Act, 42 Pa. C.S.A. §§ 6301–6365, denies substantive due process by "creating an impermissible presumption that juveniles accused of murder should be treated as adults."[1, 2] This argument is without merit.

Firstly, we note there is no constitutional guarantee of special treatment for juvenile offenders. Secondly, murder has always been within the original jurisdiction of the criminal division and excluded from the jurisdiction of the

---

1. Appellant was seventeen years of age when the crime was committed.

2. The offensive statutory provision is 42 Pa.C.S.A. § 6355(e) which provides:

 (e) **Murder.**—Where the petition [alleging delinquency] alleges conduct which if proven would constitute murder, the court shall require the offense to be prosecuted under the criminal law and procedures, except where the case has been transferred [to the juvenile division] pursuant to section 6322 (relating to transfer from criminal proceedings) from the division or a judge of the court assigned to conduct criminal proceedings.

 42 Pa.C.S.A. § 6322 provides, in pertinent part, as follows:

 [I]f it appears to the court in a criminal proceeding other than murder, that the defendant is a child, this chapter shall immediately become applicable, and the court shall forthwith halt further criminal proceedings, and, where appropriate, transfer the case to the division or a judge of the court assigned to conduct juvenile hearings, together with a copy of the accusatory pleading and other papers, documents, and transcripts of testimony relating to the case. If it appears to the court in a criminal proceeding charging murder, that the defendant is a child, the case may similarly be transferred and the provisions of this chapter applied. . . .

juvenile courts, *Commonwealth v. Pyle*, 462 Pa. 613, 622, 342 A.2d 101, 106 (1975). Appellant has cited no authority, and we know of none, why the legislature should be constitutionally prevented from making the determination that persons accused of murder should be prosecuted in the criminal division of the court of common pleas. Murder is a heinous and serious crime, and the legislature's assumption that one who commits murder is in need of adult discipline and restraint is a reasonable one. We see no reason to disturb the legislature's judgment that one, even though a juvenile, who is charged with murder be prosecuted "under the criminal law and procedures." 42 Pa.C.S.A. § 6355(e).

■ Appellant also argues that his prosecution as an adult impermissibly denied him the benefit of a presumption, created by the Juvenile Act, of incompetency to stand trial as an adult. Appellant characterizes this presumption as the "primary benefit afforded juveniles...." Appellant does not argue that he was incompetent to stand trial, nor has he indicated with precision what provision, if any, of the Juvenile Act creates a presumption of the incompetency of juveniles to stand trial in the criminal division of the court of common pleas. Our reading of the statute has disclosed none.

The stated purpose of the Juvenile Act is to remove from children committing delinquent acts the consequences of criminal behavior and to substitute therefor a program of supervision, care and rehabilitation when this is consistent with the protection of the public interest. 42 Pa.C.S.A. § 6301(b)(2). In *Kent v. United States*, 383 U.S. 541, 554–557, 86 S.Ct. 1045, 1053–55, 16 L.Ed.2d 84, 93–95, (1966), the Supreme Court of the United States observed:

> The theory of the [District of Columbia's] Juvenile Court Act, like that of other jurisdictions, is rooted in social welfare philosophy rather than in the corpus juris. Its proceedings are designated as civil rather than criminal. The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to pro-

vide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment. The State is parens patriae rather than prosecuting attorney and judge.

. . . . .

[Juvenile court] jurisdiction confers special rights and immunities. [The juvenile] is, as specified by the statute, shielded from publicity. He may be confined, but with rare exceptions he may not be jailed along with adults. He may be detained, but only until he is 21 years of age. The court is admonished by the statute to give preference to retaining the child in the custody of his parents "unless his welfare and the safety and protection of the public can not be adequately safeguarded without ... removal." The child is protected against consequences of adult conviction such as the loss of civil rights, the use of adjudication against him in subsequent proceedings, and disqualification for public employment.

Pennsylvania's statute provides similar protections, *Commonwealth v. Pyle*, supra, 462 Pa. at 620, n. 8, 342 A.2d at 105, n. 8 (1975). It does not, however, create a presumption that juveniles in Pennsylvania are incompetent to stand trial as adults. To the contrary, preservation of the criminal division's original jurisdiction in cases charging murder as well as the jurisdiction of the criminal division in other cases "where appropriate" 42 Pa.C.S.A. § 6322(a) constitutes an implicit recognition that some juveniles will be competent to stand trial as adults.

■ Appellant also claims that his trial in the criminal division, in the absence of a hearing to determine whether he was amenable to treatment as a juvenile in the juvenile division, denied him procedural due process guaranteed by the Fourteenth Amendment to the Constitution of the United States. He argues that *Kent* and *Pyle*, supra, require that a "juvenile accused of murder must be given a hearing on the issue of certification, effective assistance of counsel, and an opinion by the judge as to the reasons for certification." However, we have stated that, "in cases charging a

juvenile with murder, the criminal division has original and exclusive jurisdiction over the offense, and the burden is on the juvenile 'to show that he does not belong in the criminal court.' " *Commonwealth v. Keefer,* 470 Pa. 142, 147, 367 A.2d 1082, 1084 (1976), *cert. denied.* 434 U.S. 1009, 98 S.Ct. 717, 54 L.Ed.2d 751, *reh'g. denied* 435 U.S. 938, 98 S.Ct. 1514, 55 L.Ed.2d 534 (1978); quoting *Commonwealth v. Pyle,* supra.

> [T]he youth ... must prove that he belongs in the juvenile setting by showing his *need* and *amenability* to the "program of supervision, care and rehabilitation" which he would receive as a juvenile. In the event the evidence does not affirmatively demonstrate that he is the kind of youth who would benefit from the special features and programs of the juvenile court system and in the event no special reason exists for sparing the youth from adult prosecution and punishment (as for instance, evidence of mental illness or retardation) jurisdiction would necessarily remain within the criminal court system.

*Commonwealth v. Pyle,* supra, 462 Pa. at 622–623, 342 A.2d at 106. Appellant does not argue that he would have been amenable to treatment in the juvenile system. Moreover, at no time did appellant or his attorney ever seek to transfer the proceedings to the juvenile division as provided in 42 Pa.C.S.A. § 6322, and required by our case law. The failure to request a transfer precludes appellant from now asserting that he should have received such a hearing.

We turn our attention now to the propriety of the sentence. Appellant challenges the propriety of the sentence of death on several grounds. He argues that the evidence presented by the Commonwealth at the sentencing was insufficient to support the finding of the aggravating circumstance beyond a reasonable doubt. We disagree.

The only aggravating circumstance which the Commonwealth argued was that this was a killing for hire, 42 Pa.C.S.A. § 9711(d)(2).[3] During the sentencing hearing, the

---

3. **(d) Aggravating circumstances.**—Aggravating circumstances shall be limited to the following:

Commonwealth introduced the testimony of one Wesley Gibson who had been a cellmate of appellant's at the Butler County Jail. Gibson testified he had overheard appellant tell other inmates at the jail that "he was paid to do it," by "the guy's [victim's] wife." Defense counsel attempted to discredit Gibson by showing that he was motivated to testify thus by the Commonwealth's offers of lenient treatment. Gibson only served two months of his own four month sentence. Appellant argues that because Gibson also testified that, when he overheard, he was not sure who was the speaker, the evidence was insufficient to prove the aggravating circumstance.

The issue presented is a question of credibility which the jury resolved in favor of the Commonwealth. This was its prerogative, as it was in the best position to observe the witness and evaluate the testimony in light of appellant's attempt to show the witness's motivation to fabricate his testimony. Thus, we are constrained to hold that the evidence was sufficient to prove the aggravating circumstance that appellant participated in a killing for hire.[4]

Appellant also challenges his sentence on grounds an alternate juror communicated to one or more principal jurors that appellant had pending murder charges from another jurisdiction, and such information tainted the jury's

. . . . .

(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

**4.** Appellant also assails the imposition of the death penalty on grounds (1) that exclusion of veniremen who are opposed to the death penalty results in imposition of a penalty which does not reflect community standards and, thus, violates state and federal prohibitions against cruel and unusual punishments; that (2) the District Attorney improperly injected considerations of parole into the penalty deliberations; and (3) that it was error for the court to refuse to instruct the jury that Gibson's testimony must be carefully scrutinized because he was an informant. He also requests that we remand for an evidentiary hearing on whether Gibson was a police agent within *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In view of our disposition, we need not discuss these issues. Nor need we review the sentence for excessiveness or disproportionality as provided at 42 Pa.C.S.A. § 9711(h)(3)(iii).

deliberations.[5] The General Assembly has specified what aggravating circumstances the fact-finder may consider in deliberating on a death penalty, 42 Pa.C.S.A. § 9711(d), and pending murder charges from another jurisdiction is not one of the permissible considerations. Because the death penalty may have been the product of this extra-evidentiary information, we cannot uphold the judgment of sentence.

After the trial in this matter was completed, one of the jurors, one Judith Montgomery, swore to an affidavit that:

2. Prior to the deliberation process as to Ronald Alfred Williams' [appellant's brother's] sentencing, Paul Bowser, Jr., juror number four, stated to the entire jury that ... Raymond Williams was wanted for two (2) other murders.

3. Paul Bowser, Jr. stated that he had received that information from Gary Archer, an alternate juror.

4. Paul Bowser, Jr., further, stated the fact Raymond Williams' record was clean was because he had not been convicted yet in the other murders but following this trial he would have to stand trial on those charges in other states.

In response to this affidavit, the lower court conducted a hearing. We first consider the propriety of conducting such hearings.

The policy of this Commonwealth to protect the inviolability of jury deliberations dates from the early nineteenth century and the case of *Cluggage v. Swan,* 4 Binney 150 (1811). There, it was alleged that the verdict was arrived at by drawing lots and the deposition of one of the jurors was offered as proof. Mr. Justice Yeates carefully reviewed the practice in other jurisdictions before outlining the pitfalls inherent in a system which allows such inquiries into jury deliberations. He then stated:

I frankly confess, that I feel the utmost repugnance to such testimony, although I am fully aware, that I thereby

---

5. In post-trial motions appellant argued the impermissible information was received by the jury prior to the guilty verdict. Evidence adduced at a hearing conducted to determine when the jurors heard the information established conclusively that none of the jurors heard the objectionable matter until after the guilty verdict.

exclude almost the only evidence, which the case natural-
ly admits of. But by admitting it I as readily perceive,
that I should open a door to the exercise of the most
pernicious arts, and tampering with jurors; and that the
practice would be replete with dangerous consequences.
Jurors, who have been sworn or solemnly affirmed to
give a verdict according to evidence, come with a bad
grace into a tribunal of justice to prove their own dishon-
orable conduct, and affix a stigma on their companions
who may be unheard in their defense. Besides, in the
language of some of the cases, I cannot see how such
testimony could be heard by the court, without proceed-
ing against the jurors criminally. Should this happen,
will it not justly be deemed entrapping the jurors whose
affidavits have been used? And will it not expose others
implicated in the charge, to the temptations naturally
incident to persons in a state of accusations? We have
seen in Bradley's Lessee v. Bradley [4 Dall. 112 (1792)]
how jurors will disagree in such cases. But above all, I
greatly fear that the practice if adopted, would tend to an
inquisition over the consciences of jurors, as to the
grounds and reasons of their verdict, and bring questions
of fact more frequently before the court for their deci-
sion, than is consistent with sound policy. I am opposed
to penetrating into the recesses of a jury-room, through
the instrumentality of jurors, who are kept together until
they have agreed upon their verdict. ... Upon the whole,
after the fullest consideration, I am of opinion, that the
testimony of jurors ought not to be admitted to invalidate
their verdicts.

The policy considerations outlined by Mr. Justice Yeates in
1811 are as viable today, and the prevailing rule is that
jurors are incompetent to testify to the *effect* of extra-evi-
dentiary influences upon their deliberations. They are,
however, competent to testify to the *existence* of outside
influences. *Commonwealth v. Sero*, 478 Pa. 440, 447–448,
387 A.2d 63, 67 (1978); *Commonwealth v. Zlatovich*, 440
Pa. 388, 269 A.2d 469, (1970); *Welshire v. Bruaw et al.*, 331
Pa. 392, 200 A. 67 (1938). Thus, the jurors were competent

to testify to the fact that they were supplied information *ex curia;* however, they were incompetent as witnesses to the effect of the information on their deliberations.

The facts, as developed at the hearing, are as follows. Trial of appellant and his brother commenced on Monday, January 21, 1985, and the jury returned a guilty verdict on Thursday, January 24, 1985. The next day, Friday, January 25, 1985, appellant's brother's sentencing hearing was conducted as prescribed by the death penalty statute, 42 Pa.C.S.A. § 9711(a)(1),[6] and, as to him, the jury rendered their verdict the same day. Appellant's sentencing hearing occurred on the following Monday, January 28, 1985. Juror Montgomery testified that, on Thursday evening, after the verdict but before either of the sentencing hearings, an alternate juror who had been excused prior to deliberations on the guilty verdict, told several jurors that appellant was wanted in two other states on murder charges. This testimony was corroborated by Sharon Chernick, a reporter for the Butler Eagle. Ms. Chernick testified that on Thursday evening, while three of the principal jurors were gathered outside the courthouse talking, one of the principal jurors communicated the rumor to Juror Montgomery. The jurors themselves testified variously about when they heard there were other criminal charges involving appellant—three testified that they heard the rumors on Friday, and three heard on Monday during the deliberations on appellant's sentence. Although the testimony varies as to when certain of the jurors heard the information, what is clear is that half of the panel heard that appellant was wanted on other murder charges prior to the verdict on appellant's penalty.

█ Although incompetent to do so, see discussion supra, most of the jurors who heard the rumors were permitted to testify that they rendered their verdict that appellant be put to death independent of this information. While the

6. **(a) Procedure in jury trials.—**
 (1) After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

lower court was satisfied by the testimony that the jury was not influenced by the unsubstantiated, out-of-court rumors of other criminal acts, we hold that the sentence of death cannot be allowed to stand. Imposition of this most serious and permanent of all penalties is a matter that naturally weighs heavily on the minds and hearts of those involved. In addition to the dangers outlined by Mr. Justice Yeates in *Cluggage* there is in this case the added danger that, prior to the hearing the jurors had two weeks after rendering their verdict to become more comfortable with it, and to reassure themselves that, in fact, they had "done the right thing." Particularly in view of the fact that, after rendering their penalty verdict, they were advised by court personnel that appellant was indeed wanted for murder in other jurisdictions, the danger is great that the information not only tainted the verdict but also subconsciously gave the jurors a reinforced confidence in their decision which enabled them to convince the court that, in fact, the verdict was rendered on only proper considerations.

In *Commonwealth v. Santiago,* an alternate juror related in the presence of three other jurors that she had been approached in the courthouse by someone who said that the defendant had killed others in addition to the victim in the case then before the jury. Despite the fact the jurors indicated they would not be persuaded by the improper information, this Court granted Santiago a new trial. We stated:

> "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907).

> . . . . .

> In this case the remarks heard by the three jurors would not have been admissible during the trial, and their admission, over objection, would have constituted reversible error. The prejudice to the appellant is no less when

the remarks are made outside the courtroom. The appellant was entitled to an impartial and indifferent jury. His motion for a mistrial should have been granted.

456 Pa. 265, 268–270, 318 A.2d 737, 739–40 (1974). Santiago was granted a new trial.

The question remaining is what is the appropriate remedy in this case. As noted, supra, if the same evidence were admitted at the guilt-determining stage, the proper remedy would be to grant a new trial. By analogy then, we would remand for a new trial of the penalty question. However, we do not have the authority to remand for a new "trial" only on the question of the appropriate penalty. Section 9711(a), which provides that the court conduct a separate sentencing hearing "[a]fter a verdict of murder of the first degree is recorded and before the jury is discharged," indicates clearly the General Assembly's intention that the penalty be fixed by the same jury which determined guilt. Moreover, our review of sentences of death is limited by 42 Pa.C.S.A. § 9711(h) which provides, in relevant part:

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

This constitutes a clear limitation upon our general power to "affirm, modify, vacate, set aside ... reverse ... and ... remand the matter and direct the entry of such appropriate order, or require such further proceedings ... as may be just under the circumstances." 42 Pa.C.S.A. § 706.[7] The wisdom of this limitation is for the General Assembly and not this Court to consider.

Thus, we affirm the judgments of sentence as to the charges of conspiracy to commit murder, possessing instrument of crime, prohibited offensive weapon, receiving stolen

7. Appellant has also filed a "motion for leave to file supplemental brief ... containing approximately four concise issues", but has failed to include in his motion precisely what the issues are or why they were not included in the original brief filed in this appeal. This motion is denied. Likewise, appellant's motion to supplement the record on appeal is denied.

property, firearms not to be carried without a license and fleeing to elude; we reverse the judgment of sentence of death and remand the record to the trial court for imposition of a life sentence.

NIX, C.J., joins this opinion and files a concurring opinion in which McDERMOTT, J., joins.

PAPADAKOS, J., concurs in the result.

LARSEN, J., files a concurring and dissenting opinion.

NIX, Chief Justice, concurring.

While I join the majority opinion, I do believe there is merit in the position of Mr. Justice Larsen relating to the right of this Court to remand the cause for a new sentencing procedure that is not tainted. In such a proceeding the option for the reentry of the death penalty should be available. *See United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). Such a construction would not only protect the defendant who complains of error during the sentencing stage but would also protect society. However, in light of the language of section 9711(h)(2) of the Sentencing Code, 42 Pa.C.S. § 9711(h)(2), such a clarification is best left to the legislature. As the statute is presently construed, judicial tribunals are reluctant to overturn sentences of death, particularly in circumstances as horrendous as this, where that action precludes the reimposition of a sentence of death, even though the subsequent proceeding is free of error and such a sentence is fully justified under the evidence.

McDERMOTT, J., joins in this concurring opinion.

LARSEN, Justice, concurring and dissenting.

While I agree with the majority that appellant received a fair trial and that his convictions should be affirmed, I dissent to its disposition of his judgment of sentence of death.

Prior to his sentencing proceeding (but after he was convicted at the guilt phase), at least some of the jurors did,

indeed, hear extraneous, improper and prejudicial information concerning supposed "murder charges" in other states. Thus, I agree with the majority that "Because the death penalty *may have been* the product of this extra-evidentiary information, we cannot uphold the judgment of sentence." At 76. However, I do not agree that simply because we cannot *uphold* the judgment of sentence of death, then we must necessarily *vacate* that sentence and remand for imposition of a life sentence.

It is true that the Sentencing Code states that, in addition to our authority to correct trial errors, we "shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence." 42 Pa.C.S.A. § 9711(h)(2). This provision does seem to support the majority's conclusion that we do not have the authority to vacate the sentence of death and remand for a new sentencing hearing. Section 9711(h)(2) does not stand alone, however.

Section 9711(h)(3) instructs this Court to *affirm the sentence of death unless we determine* that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

The majority has not determined, in the instant case, that the evidence did not support an aggravating circumstance, that the sentence is excessive or disproportionate, or that the "sentence of death was the product of passion, prejudice or any other arbitrary factor". As we have seen, appellant's sentence of death *may* well have been influenced by prejudicial and arbitrary factors—rumors of "other murders." However, there was overwhelming evidence of an execution-style murder of the victim and sufficient evidence to prove beyond a reasonable doubt that appellant was paid

by another person to execute the "contract." It is not apparent, therefore, whether the "sentence of death was *the product of* passion, prejudice or any other arbitrary factor," or was *the product of the Commonwealth's evidence.*

Accordingly, while we cannot affirm a sentence of death that may have been influenced by prejudicial and arbitrary factors, neither can we simply vacate the sentence and impose a sentence of life imprisonment where, as here, the sentence of death could have been the product of the law and the evidence, as many of the jurors believed it to be. As Chief Justice Nix stated in dissent in *Commonwealth v. Christy,* 511 Pa. 490, 515 A.2d 832 (1986), although "section 9711(h)(2) could be interpreted to foreclose the alternative of remanding for a new sentencing hearing, I do not believe that such a result is necessarily mandated." Slip op. at 2, n. 1. *See also Commonwealth v. Stoyko,* 504 Pa. 455, 476–484, 475 A.2d 714, 725–730 (1984), *cert. denied* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984) (Nix, C.J., would have remanded for appointment of new counsel to argue objections relating to imposition of death penalty; Hutchinson, J., would have remanded for appointment of new counsel and a hearing on ineffective assistance of trial counsel at the penalty phase of trial).

Thus, this case presents us with a situation which is not specifically addressed by the Sentencing Code, one where we can neither affirm nor vacate and impose a sentence of life imprisonment. Because it presents a situation not covered by the Sentencing Code, I would resort to our statutory authority under the Judicial Code to "affirm, modify, *vacate,* set aside or reverse any order" brought before us for review and to *"remand the matter and* direct the entry of such appropriate order, or *require such further proceedings to be had as may be just under the circumstances."* 42 Pa.C.S.A. § 706. Where, as here, the record of the sentencing proceeding discloses the existence of arbitrary and prejudicial factors that may have influenced the sentence of death, but where this Court is unable

84

to determine that such factors *produced* the sentence of death because there was sufficient evidence to prove an aggravating circumstance beyond a reasonable doubt, we should vacate the sentence of death and remand the case to the court of common pleas to conduct a new sentencing proceeding.[1]

---

1. As this position has not been adopted by a majority of the members of this Court, I urge the legislature to act to fill the gap in the Sentencing Code so that similarly situated defendants (*i.e.,* those whose sentencing proceeding was possibly tainted by some passion, prejudice or other arbitrary factor, but whose sentence of death was fully supported by the record and by an aggravating circumstance) will be able to receive the appropriate sentence designated by a jury in a proper sentencing proceeding.