562 A.2d 289

COMMONWEALTH of Pennsylvania, Appellee,

v.

Randy Todd HAAG, Appellant.

Supreme Court of Pennsylvania.

Argued April 12, 1989.

Decided July 10, 1989.

392

Robert L. Van Hoove, Reading, for appellant.

Paul Yatron, Executive Deputy Atty. Gen., Andrea F. McKenna, Deputy Atty. Gen., Robert A. Graci, Chief, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

On February 7, 1986, in a trial by jury in the Court of Common Pleas of Berks County, the appellant, Randy Todd

Haag, was found guilty of murder of the first degree and kidnapping. In connection with the murder conviction, a separate sentencing hearing was held, as required by 42 Pa.C.S. § 9711, and appellant was sentenced to death. A consecutive sentence of ten to twenty years imprisonment was imposed for the kidnapping conviction. The present appeal ensued. As we find no error in the proceedings, we affirm the judgment of sentence.

## I. SUFFICIENCY OF THE EVIDENCE

■ Appellant has challenged the sufficiency of the evidence supporting his conviction for murder of the first degree. In all cases where a sentence of death has been imposed, a determination is made by this Court as to whether the evidence is sufficient to sustain a conviction for murder of the first degree. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In the present case, the evidence is more than sufficient to establish guilt beyond a reasonable doubt.

■ The incident from which the convictions arose took place in Berks County where appellant and several cohorts kidnapped and shot an individual, Richard Good, and then disposed of the body in a river. The evidence linking appellant to the crime consisted of, inter alia, the following.

One of appellant's acquaintances, Steven Grynastyl, testified that one evening in February or March of 1982 he received a phone call from a friend, Michael Slote, who informed him that appellant was "all cranked up" and wanted to kill Richard Good that night. Grynastyl went immediately to Slote's residence, where he met with Slote, appellant, and another acquaintance, Howard Weisman. Appellant offered $5,000.00 for Slote and Grynastyl to kill Good immediately with a high-powered rifle, wrap the body in carpet, weight it down, and dump it in a lake or river. Appellant and Weisman then decided, however, that it would be too risky to go through with the killing that night, due to the fact that freshly fallen snow would leave traces

of footprints. Grynastyl also testified that, approximately one week previous to this, he heard appellant express a desire that Good be killed because Good owed appellant and Weisman money for cocaine purchases.

Months later, on July 14, 1982, Slote had a conversation with Good's daughter, Vickie Lee Good. Miss Good testified that Slote asked her to have her father call him later that day because Slote expected to receive some cocaine. Around 10:00 p.m. that evening, Miss Good was dispatched by her father, who earned his living as a drug dealer, to a pay phone to call Slote and inquire whether the cocaine was available. Slote then told her to have her father come, alone, to see him after 11:00 p.m. Good departed at the appointed hour, in his black Corvette, and was never again seen alive by his daughter. Good planned to visit his girlfriend after stopping to see Slote, but never arrived at her house. Miss Good testified, also, that her father owed money to Slote and appellant for drugs, and that, a year earlier, her father and appellant had been involved in an altercation with one another.

An individual who resided in a townhouse with appellant and Weisman at the time of the crime, Van Scott Peters, who worked as a drug runner for appellant, testified that he visited Slote's house late in the evening of July 14, 1982. He was taken there by appellant, Weisman, and one Michael Sands. Upon arriving there, appellant instructed everyone to wait in Slote's bedroom so that Good, who was expected to arrive soon, would not see them. Peters had previously heard appellant say that he disliked Good and that Good owed him money. When Good arrived, he was led into the bedroom by Slote, whereupon Sands pointed a rifle at him. Slote and Weisman grabbed Good, and appellant took the rifle from Sands and began beating Good with the rifle butt. Appellant then yelled at Good and punched him repeatedly, causing him to fall to the floor, after which appellant, Weisman, and Slote tied him up and carried him to the basement. Appellant then directed Peters and Sands to watch that Good did not untie himself. Less than an hour

later, around midnight, while Good was still alive, appellant gave Peters some money, cocaine, and the keys to Good's black Corvette and told him to drive the car to Florida. Peters, accompanied by Sands, departed immediately and drove to Hollywood, Florida, where they stored the car.

On July 20, 1982, police were alerted when Good's body was discovered by a fisherman at the Susquehanna River. Good had been shot in the head, and his body was partially submerged, having been bound in rope, wrapped in carpet, and weighted down with concrete blocks and chains secured by a connecting link and padlock.

Peters testified that, upon his return to Berks County from Florida, appellant and Weisman told him that the Pennsylvania State Police wanted to talk to him and that he had been spotted in Florida in the black Corvette. They instructed Peters to tell the police that he had been driving in Florida until his car broke down and that a man in a black Corvette picked him up. Appellant chastised Weisman for not having attached sufficient weight to Good's body to keep it submerged. Appellant also instructed Peters to remove a concrete block from outside their townhouse and to travel in appellant's car to a garage that appellant used for storage, and to remove all of the carpet scraps from the garage. Weisman and Peters later dumped the block and the carpeting into a landfill dump site, for appellant had instructed them to dispose of the items. Weisman told appellant and Peters that a length of chain should be purchased and kept on hand, since police might become suspicious if they found out that Weisman purchased a chain at Leinbach Hardware Store just before Good's death. The chain had been used to bind Good's body for disposal. Hence, Peters and Weisman purchased a new chain at a different hardware store.

Peters testified further that, on July 14, 1982, when Good was attacked at the Slote residence, yet another individual, Bruce Ream, was present in the house. Ream did not participate in the criminal incident. He resided in Slote's

house, and remained in another bedroom throughout most of the evening.

The testimony of Sands was also presented at trial. Sands substantiated in all major respects the account given by Peters as to the events which occurred at Slote's residence on the evening of July 14, 1982. Sands had not, however, noticed the presence of Ream in Slote's house that night.

Next, Ream testified that he resided in one of the bedrooms at Slote's house, and that he had gone to bed around 9:30 p.m. on the evening in question. Slote had earlier said to him, "Tonight's the night." He remained in his bedroom with the door closed all evening and emerged only briefly on one occasion, at which time he saw appellant, Slote, Weisman, Peters, and Sands in another bedroom snorting cocaine. After returning to his bedroom, he heard a number of sounds through the thin walls. He heard a car arrive, and then heard Slote answer the door. Good's voice was detected, and a number of people started yelling. Ream heard appellant say, "You're going swimming." He then heard something being dragged down the basement steps, and an argument ensued in the basement. Shortly thereafter, Ream heard a car being driven away from the house, and saw the car's brake lights in the darkness. Approximately fifteen minutes later, he heard a single gunshot.

Ream heard nothing more that night and departed for work early in the morning. After returning home in the evening, on July 15, 1982, he overheard a meeting of appellant, Slote, and Weisman. They were saying, "Just keep your mouth shut. Keep a cool head." Slote asked appellant for "double payment" for being the "trigger man," and then Slote and appellant went to another room to discuss the matter. Appellant told Ream to keep his "mouth shut."

Approximately two days later, Ream listened to another conversation between appellant and Slote. Appellant gave Slote two ounces of cocaine and said, "I'll pay you the rest

later." Many months later, while police were investigating Good's death, appellant told Ream he would like to have the Pennsylvania State Police barracks blown up. Appellant also named four state police officers who were involved in the investigation of Good's death, and said he would "like to have them found in the river, too." In addition, appellant said it was Weisman's fault that Good's body had been discovered, and that he, i.e., appellant, was only supposed to have handled the "financial end."

A cashier from the Leinbach Hardware Store testified that late in the summer of 1982 he was asked by Weisman to destroy a copy of a charge slip, dated July 13, 1982, which reflected Weisman's purchase of rope, chain, a connecting link, and a padlock. The cashier did not, however, destroy the charge slip. The items purchased were just like those found wrapped around Good's body when it was recovered from the river. Also, a former automobile dealer testified that he sold his dealership to appellant approximately one year prior to Good's death, and that the dealership office had been carpeted in a tricolored carpet exactly like the one in which Good's body was found.

Scientific evidence was adduced at trial, too, including the results of an autopsy performed on Good's body on July 20, 1982 by a forensic pathologist, Dr. Mihalikis, who concluded that the cause of death was a shotgun blast to the head. Dr. Mihalikis stated that death likely occurred five days, plus or minus one day, prior to the autopsy. This would place the date of death between July 14 and July 16, 1982. Notably, Ream testified that Slote owned a shotgun around that time, but that he had not seen the gun after July 14, 1982. A police search of Slote's bedroom uncovered two shotgun shells, loaded with no. 2 size lead pellets. The pellets recovered from Good's skull during the autopsy were of size no. 2.

Evidence of the time of death was also furnished through the testimony of a forensic toxicologist who examined stomach contents removed during the autopsy. The contents included beef fibers, leafy vegetable matter, and processed

wheat grain. The toxicologist testified that these substances could have been the remains of prepared lunch meat, lettuce, and bread. He also gave his opinion that the food had been consumed three to six hours before death. This is significant because Miss Good testified that she fixed her father a sandwich of bologna, cheese, lettuce, and bread at 8:30 p.m. on July 14, 1982, just two and one-half hours prior to his departure to visit Slote.

Upon consideration of the foregoing evidence, we hold that appellant's guilt was plainly established beyond a reasonable doubt. Appellant has characterized the Commonwealth's evidence as contradictory and "all over the park." Such a characterization is patently without basis. Our examination of the testimony, as heretofore recounted, discloses remarkable consistency in its content. The testimony of numerous witnesses, as well as the physical evidence introduced, all supported the jury's determination that appellant participated in the kidnapping and murder of Good on July 14, 1982.[1]

## II. ALLEGED TRIAL ERRORS

Appellant's first claim is that the trial court erred in failing to grant a change of venire after two allegedly prejudicial articles were published on January 13 and 14, 1986, in the *Williamsport Sun–Gazette*. Voir dire was conducted on the same dates the articles appeared. The article of January 13 summarized the charges against Haag, described the questioning of prospective jurors, indicated that Good's murder was related to money and drugs, and stated that a co-conspirator was convicted of Good's murder in a separate trial. The January 14 article continued to describe the jury selection process, again described

---

1. It may be noted that the defense presented various witnesses at trial, but they provided little significant testimony. Appellant did not testify. The defense relied primarily upon the testimony of an individual, James Pappadakes, who, while riding in an automobile in the darkness of the night of July 17, 1982, believed he saw Good standing along a street. The defense sought thereby to contradict the Commonwealth's overwhelming evidence that Good was killed late in the evening of July 14, 1982 or early in the morning of July 15, 1982.

the murder, and stated that appellant "allegedly" paid to have Good killed.

Appellant's claim is that this publicity tainted the jury panel. In *Commonwealth v. Romeri*, 504 Pa. 124, 132, 470 A.2d 498, 502 (1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984), we stated:

> [E]ven if there has been extensive pre-trial publicity, a fair trial is not necessarily precluded. Instead, once the fact of pre-trial publicity is determined, the inquiry then turns to the nature of the publicity and its effect on the community.

In order for a change of venire to be required, the publicity must be "inherently prejudicial" and the defendant must have been actually prejudiced.[2]  *Id.*, 504 Pa. at 131–32, 470 A.2d at 501–02.

■ We agree with the trial court that the nature of publicity in this case is not of the type that we have determined to be "inherently prejudicial."[3]  As we stated in *Romeri*, publicity which is "inherently prejudicial" is publicity which has "saturated and prejudiced the community." *Id.*, 504 Pa. at 130, n. 1, 470 A.2d at 501, n. 1.  Here, neither the content of the stories nor their impact, as revealed at voir dire, suggests that the stories were "inherently prejudicial."  Of the fourteen jurors selected, eight knew nothing or knew only that they were required to go to Berks County if selected; the remaining six had some awareness of the facts of the case, but none had a fixed opinion as to the defendant's guilt or innocence.  The fact that some jurors were aware of the articles before voir dire is of no legal consequence.  All that is required is that the jury be able to disregard any impression or opinion of the case and render a verdict based on the evidence.  *Id.*, 504 Pa. at 135, 470 A.2d at 503–04.  It was not error, therefore, under these

2. This case does not involve pretrial publicity that is so sustained, pervasive, inflammatory and inculpatory as to require a change of venue without any consideration of prejudice. *See Romeri* at 131–32, 470 A.2d at 502.

3. *See Romeri* at 131, 132–33, 470 A.2d at 501, 502.

circumstances, to deny appellant's motion for a change of venire.

■ Next, appellant argues that the trial court erred in refusing to grant his motion for a mistrial after the Commonwealth knowingly offered false or perjured testimony through Van Scott Peters. Peters testified that he gave a police statement implicating appellant in the murder of Good without expecting anything in return from the Commonwealth except that if he cooperated, the Commonwealth would indicate that at his sentencing. Appellant argues that this testimony was false in that the Commonwealth also promised that if Peters' testimony was truthful and could be corroborated, and indicated that he was not involved in the murder, he would not be prosecuted for murder. Since Peters did not mention this prior agreement, appellant asserts that Peters' testimony was false and that the Commonwealth knowingly allowed the false testimony to be offered into evidence.

Appellant's argument is frivolous. When the Commonwealth tells a person suspected of a crime that he will not be prosecuted if his statement indicates no knowledge of the crime and that statement can be corroborated, this does not constitute a "deal" or a "prior agreement" that must be disclosed to a jury. Rather, it is merely a statement of the limitations of prosecutory power. The state's attorney has no authority to prosecute persons believed to be innocent of crime; in fact he has a duty not to prosecute persons believed to be innocent. It was not error to fail to grant a mistrial on this basis.

■ Next appellant claims that it was error for the trial court not to have granted a mistrial when defense counsel asked a Commonwealth witness, Michael Sands, how he learned about this case, and the witness said his mother told him that "Mr. Haag and Mr. Weisman had been arrested on another kidnapping charge." Appellant's argument is based on the idea that he was improperly prejudiced when a Commonwealth witness made reference to appellant's involvement in another crime.

This Court has held that where the Commonwealth did not deliberately elicit the reference to a prior unrelated crime, did not exploit the reference, and introduced no evidence of the prior unrelated crime, a prompt curative instruction is sufficient to negate any prejudice which may have resulted. *Commonwealth v. Richardson*, 496 Pa. 521, 437 A.2d 1162 (1981). Here, the Commonwealth did not elicit the improper remark, it did not exploit the remark or introduce any evidence of appellant's involvement in a prior crime, and the trial court properly instructed the jury to disregard the remark. Failure the grant the mistrial, therefore, was not error.

■ Appellant also claims that it was error for the court not to allow the the same witness, Sands, to testify as to his state of mind while he held a rifle pointed at Good. Appellant's rationale is that since the Commonwealth took the position throughout the trial that Sands was not really involved in the kidnapping or murder of Good, the witness's "mental attitude" was a proper matter for jury consideration. In order for evidence to be relevant, it must tend to establish some fact material to the case or tend to make the fact at issue more or less probable. *Commonwealth v. Myers*, 439 Pa. 381, 384, 266 A.2d 756 (1970). At issue in this case is appellant's guilt in the murder of Good. Whether a co-actor did or did not have certain thoughts while he held the victim at gunpoint is irrelevant to the issue in the case. The testimony was properly excluded.

■ Appellant's next claim is that it was error to allow the testimony of a cashier from the Leinbach Hardware Store where Weisman purchased a length of chain and other items that were used to bind the body of Good. The cashier testified that during the summer of 1982 Weisman asked him to destroy the store's copy of a charge receipt showing that Weisman had purchased a chain, rope, connecting link, and padlock on July 13, 1982. The alleged error in admitting this testimony is that it was hearsay and was not admissible pursuant to the co-conspirator exception

402

to the hearsay rule because the conspiracy had concluded prior to the time of the conversation.

In *Commonwealth v. Evans,* 489 Pa. 85, 92, 413 A.2d 1025, 1028 (1980), this Court stated:

"The declarations or acts of one conspirator made to third parties in the absence of his co-conspirator are admissible in evidence against *both* provided that such declarations or acts were made during the conspiracy and in furtherance of the common design."

*Id.,* 489 Pa. at 92, 413 A.2d at 1028, quoting *Commonwealth v. Porter,* 449 Pa. 153, 161, 295 A.2d 311, 314 (1972); *Commonwealth v. Ellsworth,* 409 Pa. 505, 509, 187 A.2d 640, 642 (1963).

As we explained in *Evans,* acts by a co-conspirator to conceal evidence after the commission of a crime are not within the scope of the conspiracy unless the conspirators "originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence [exists] from which such an agreement may reasonably be· inferred.... *Atkins v. United States,* 307 F.2d 937, 940 (9th Cir.1962)." *Id.,* 489 Pa. at 93, 413 A.2d at 1029. In the present case, there is evidence that the conspirators agreed, as part of their original plan, to conceal evidence of their crime. Accordingly, they drove Good's car to Florida and submerged Good's body in a river. Attempting to destroy the receipt for the items purchased to bind Good's body was merely a continuation of their original plan. It was not error, therefore, to admit the testimony of the cashier.

The next issue raised by appellant has no merit whatsoever. He challenges the trial court's ruling that if he were to testify in his own defense, the Commonwealth would be permitted to impeach his credibility by introducing evidence of his criminal record. He argues that he was denied the right to testify because the trial court incorrectly applied the holdings of *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255 (1973), and *Commonwealth v. Roots,* 482 Pa. 33, 393 A.2d 364 (1978).

■  In determining whether to permit evidence of appellant's criminal record, the trial court considered the factors set forth in *Bighum* and *Roots,* and decided that appellant's one recent conviction of perjury would be admissible if he testified, as it had great relevance to his truthfulness and little tendency to indicate a propensity to kill and kidnap. As the trial court stated, "Perjury is the quintessence of a *crimen falsi* crime." We find no fault with the court's reasoning.

Nevertheless, this Court's recent decision in *Commonwealth v. Randall,* 515 Pa. 410, 415, 528 A.2d 1326, 1329 (1987), makes the question academic. Under the holding of *Randall,* "evidence of prior convictions can be introduced for the purpose of impeaching the credibility of a witness if the conviction was for an offense involving dishonesty or false statement, and the date of conviction or the last day of confinement is within ten years of the trial date," there is no question that appellant's record should have been admissible had he chosen to testify.

Finally, appellant contends that the trial court erred in denying a jury instruction requested by the defense. The requested instruction was that the Commonwealth had a burden of proving beyond a reasonable doubt that the kidnapping and murder of Good occurred, as alleged in the Commonwealth's bill of particulars, late in the evening of July 14, 1982 or early in the morning of July 15, 1982. The instruction was sought because the defense had introduced the testimony of a witness who believed he saw Good alive on July 17, 1982. See fn. 1, supra. The Commonwealth's evidence overwhelmingly indicated a time of death consistent with that specified in the bill of particulars.

A bill of particulars is intended to provide notice to an accused of the factual basis for offenses charged in an indictment. It serves to avoid surprise at trial, and affords the accused an opportunity to prepare a defense. *Commonwealth v. Dreibelbis,* 493 Pa. 466, 472, 426 A.2d 1111, 1114 (1981). Appellant was not surprised at trial, for the

Commonwealth's evidence supported the time of death set forth in the bill of particulars.

It is the trial court's duty to instruct the jury as to the elements of crimes with which the defendant has been charged. *Commonwealth v. Ford–Bey*, 504 Pa. 284, 289, 472 A.2d 1062, 1064 (1984). The time of death in a murder case is not, however, one of the elements of the crime of murder. See generally *Commonwealth v. Nole*, 448 Pa. 62, 64, 292 A.2d 331, 332 (1972); *Commonwealth v. Burns*, 409 Pa. 619, 626, 187 A.2d 552, 556 (1963). It is not necessary, therefore, that the time of death be proved beyond a reasonable doubt. The requested jury instruction was properly denied.

## III. DEATH SENTENCE

Appellant has raised issues pertaining to the validity of the sentence imposed, but none are of substance. It is asserted that the trial court erred in denying a defense request that separate juries be utilized at the guilt and penalty phases of trial. Appellant reasons that a jury cannot impartially decide upon a penalty if it has heard evidence as to guilt. We do not agree. The death penalty statute plainly requires that the *same* jury preside at both phases of trial. 42 Pa.C.S. § 9711(a)(1) ("After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment."). See also *Commonwealth v. Williams*, 514 Pa. 62, 80, 522 A.2d 1058, 1067 (1987) ("penalty [to] be fixed by the same jury which determined guilt."). Further, the practice of using the same jury at both phases of trial has been expressly approved by the Supreme Court of the United States. *Lockhart v. McCree*, 476 U.S. 162, 180–82, 106 S.Ct. 1758, 1768–70, 90 L.Ed.2d 137, 152–53 (1986).

At the penalty stage of this proceeding, the jury found that there was present the aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(2), to wit, that "defendant

paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim." The evidence in this case, described supra, makes it clear that the murder in which appellant and his cohorts participated was committed in conjunction with appellant's offer to make a payment therefor. Appellant offered $5,000.00 to Slote and Grynastyl to kill Good. Later, when the murder was carried out with Slote's but not Grynastyl's assistance, Slote asked appellant for "double payment" for having been the "trigger man." Two days later, after giving Slote two ounces of cocaine, appellant said, "I'll pay you the rest later." Months later, when discussing the murder with Ream, appellant stated that he, i.e., appellant, was supposed to have handled the "financial end." The evidence established the relevant aggravating circumstance beyond reasonable doubt, and it cannot be said, therefore, that the evidence failed "to support the finding of an aggravating circumstance specified in subsection (d)." 42 Pa.C.S. § 9711(h)(3)(ii).

The jury also found one mitigating circumstance, based upon "the character and record of the defendant and the circumstances of his offense," 42 Pa.C.S. § 9711(e)(8). Examination of the record reveals that the defense presented, at best, only the most minor evidence of mitigating circumstances. Appellant's mother testified that appellant was troubled with asthma, and that, despite his good childhood, he came to associate with undesirable friends when he became an adult. Appellant's accountant testified also, describing appellant as "cooperative" and "honest." In short, the record provides no basis upon which additional mitigating circumstances could have been found.

Appellant asserts that the trial court unduly restricted the presentation of mitigating evidence, but no particular instance of such a restriction has been specified. Such an inadequately briefed issue might properly be dismissed by this Court, but, inasmuch as a sentence of death is involved, we have examined the issue. A review of the record of the

sentencing hearing, however, reveals no instances of trial court error.

■ If appellant's assertion is taken as referring to the court's ruling that the jury would not be apprised of Weisman's acquittal and Slote's sentence of life imprisonment, the issue is without merit. As discussed infra, the disposition of the cases against Weisman and Slote has no bearing upon appellant's sentence. See also *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27, 33 (1989) (life sentence received by co-conspirator was not a mitigating circumstance for purposes of sentencing another defendant).

■ In the alternative, the alleged restriction on presentation of mitigating evidence may be taken as referring to the trial court's ruling that certain testimony, if introduced by the defense during the sentencing hearing, could be impeached on cross-examination. Defense counsel planned to have appellant's mother testify that appellant had never been in trouble with the law during the entire time that he resided with her, i.e., from childhood through the latter part of 1981. Such testimony would have been admissible to establish the mitigating circumstance set forth in 42 Pa.C.S. § 9711(e)(1), that "defendant has no significant history of prior criminal convictions." Defense counsel's decision not to have appellant's mother testify on that subject, after the court ruled that she could be impeached, cannot be regarded as a restriction by the court upon the presentation of mitigating evidence.

■ The court's ruling on impeachment was proper, for appellant committed and was convicted of a number of crimes after the present offense, and the prosecution advised that it would inquire on cross-examination as to whether appellant's mother was aware of those convictions. Defense counsel argued that crimes or convictions occurring after the crime for which appellant was being tried should not be considered "prior criminal convictions" for purposes of 42 Pa.C.S. § 9711(e)(1), supra, and, thus, that such crimes should not be used for impeachment. We do

not agree. Appellant would construe 42 Pa.C.S. § 9711(e)(1) as though it read, "defendant *had* no significant history of prior criminal convictions at the time of the offense at issue." The plain language of the provision does not, however, comport with such a construction. Rather, it expressly frames the inquiry as whether defendant "has" a significant history of prior criminal convictions, and this must be evaluated as of the time of the sentencing hearing.

In addition, in construing provisions of the sentencing code relating to aggravating circumstances, we have allowed convictions arising from crimes committed after the subject offense to be introduced at the sentencing stage. Under 42 Pa.C.S. § 9711(d)(9), which makes it an aggravating circumstance that a "defendant has a significant history of felony convictions involving the use or threat of violence to the person," convictions for offenses occurring after the subject offense have been held admissible. *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460 (1984). We see no reason to treat convictions relating to mitigating circumstances differently, for the sentencing code should be regarded as consistent in the meaning to be accorded "convictions" where the same overall section of the code is concerned. Convictions obtained before or after the offense at issue are relevant to the question of whether a defendant has a significant history of prior criminal convictions. Further, it may be noted that certain of the aggravating circumstances enumerated in the statute expressly provide that the convictions to which they refer must have been "committed either before or at the time of the offense at issue," 42 Pa.C.S. § 9711(d)(10)–(12). Comparable language does not appear in the provision regarding the mitigating circumstance here concerned. Impeachment of the testimony of appellant's mother could, therefore, properly have included reference to crimes committed after the present offense.

In returning a verdict of death, the jury rested its decision upon a finding of one aggravating circumstance that outweighed any mitigating circumstance. 42 Pa.C.S.

§ 9711(c)(1)(iv). The sentencing statute provides that, where aggravating circumstances outweigh mitigating circumstances, a verdict of death is *required. Id.*

Nevertheless, appellant alleges that imposition of the death penalty in this case is arbitrary and capricious, in view of the fact that other alleged participants in the crime did not receive death sentences. Weisman and Slote were tried for murder prior to appellant's trial. Weisman was acquitted. Slote, the trigger man in the murder, was convicted, and was sentenced to life imprisonment. When sentencing one who has been convicted of crime, it is of no relevance that another defendant has been acquitted on charges arising from the same crime. Further, we have repeatedly rejected the argument that a death sentence for an accomplice to a murder is arbitrary and disproportionate where the trigger man received a sentence of life imprisonment. *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Sentencing is a highly individualized matter, which takes into account a multitude of factors pertaining to each defendant's character, record, and participation in crime. The aggravating and mitigating circumstances applicable to different defendants involved in the same crime are variable as well, and, even where they are substantially similar, fine qualitative differences may warrant different sentences. Sentencing does not involve a rigid and mechanical application of aggravating and mitigating factors. *Commonwealth v. Frey,* 504 Pa. at 445, 475 A.2d at 708. Jurors are expected to exercise their discretion in a manner that applies their wisdom and experience, making judgments about a defendant's character and the warranted punishment. These factors do not render a sentence arbitrary, even where a co-defendant has received a different sentence. *Id.* Appellant's sentence is not, therefore, rendered arbitrary by the fact that Slote did not receive an identical sentence.

In accordance with our duty, under 42 Pa.C.S. § 9711(h)(3)(iii), to review sentences of death from the

standpoint of their proportionality to sentences imposed in similar cases, *Commonwealth v. Zettlemoyer*, 500 Pa. at 62, 454 A.2d at 961, we have reviewed the sentence imposed upon appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. See *Commonwealth v. Frey*, 504 Pa. at 443, 475 A.2d at 707–08. Our review has focused upon cases where there was present the aggravating circumstance set forth in subsection (d)(2) (payment for killing), and where the mitigating circumstance specified in subsection (e)(8) (pertaining to character and record of defendant and circumstances of the offense) was present, such being the circumstances of the present case. The death penalty has been imposed in a substantial portion of such cases. Thus, appellant's sentence of death is neither excessive nor disproportionate to the penalties imposed in similar cases. Further, the record does not provide any basis for belief that the sentence imposed was the "product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i). Accordingly, the sentence must be affirmed.

Judgment of sentence affirmed.

NIX, C.J., filed a concurring opinion.

NIX, Chief Justice, concurring.

I continue to embrace the view that the standard set forth in *Commonwealth v. Romeri*, 504 Pa. 124, 132, 470 A.2d 498, 502 (1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984), is inappropriate for determining whether news coverage was so "inherently prejudicial" that prejudice can properly be presumed. *Commonwealth v. Romeri*, 504 Pa. at 139, 470 A.2d at 506 (1983), (Nix, J., dissenting). Notwithstanding, I am satisfied that the facts of this case would not warrant such a presumption under what I consider to be the proper test. *See Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978); *Commonwealth v. Frazier*, 471 Pa. 121, 369 A.2d 1224 (1977); and *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973), *cert. denied*, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).

Additionally, I remain of the view that *Commonwealth v. Richardson*, 496 Pa. 521, 437 A.2d 1162 (1981), was wrongly decided and therefore I do not rely upon it for support of the Commonwealth's position in this matter. I am satisfied that the inadvertent reference to a prior crime in this factual setting did not constitute reversible error. The evidence was not elicited by the Commonwealth; it was not exploited after the comment was made; and, there was no deliberate attempt to introduce evidence of appellant's involvement in a prior crime. The prompt curative instruction provided by the trial court was sufficient to negate any prejudice which may have otherwise resulted. *Compare, Commonwealth v. Williams*, 470 Pa. 172, 368 A.2d 249 (1977); *Commonwealth v. Fortune*, 464 Pa. 367, 346 A.2d 783 (1975).

With these observations, I join the mandate of the Court.