568 A.2d 646

**Andrew CARTER, a Minor, by his Parent and Natural Guardian, Donald CARTER, and Donald Carter, in his Own Right, Appellants,**

v.

**UNITED STATES STEEL CORPORATION.**

**Andrew CARTER, a Minor, by his Parent and Natural Guardian, Donald CARTER, and Donald Carter, in his Own Right**

v.

**UNITED STATES STEEL CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 27, 1989.

Filed Jan. 4, 1990.

268

Edward J. Balzarini, Pittsburgh, for appellants (at 1652) and appellees (at 1688).

C. Ritcher Taylor, Jr., Pittsburgh, for appellant (at 1688) and appellees (at 1652).

Before CIRILLO, President Judge, and CAVANAUGH, BROSKY, McEWEN, OLSZEWSKI, BECK, TAMILIA,* POPOVICH and JOHNSON, JJ.

CIRILLO, President Judge:

This is an appeal from an order of the Court of Common Pleas of Allegheny County, granting United States Steel Corporation's (hereinafter USX) motion for a new trial, and denying its motion for judgment *non obstante veredicto*. We affirm.

In 1984, USX maintained and partially operated a steel manufacturing plant, known as the Carrie Furnace Works, along the eastern bank of the Monongahela River in the borough of Swissvale. Between December of 1983 and June of 1984, Andrew Carter, a fourteen year-old resident of Swissvale, frequently trespassed with his friends, including Christian Stonebraker, on the plant property. While steel manufacturing at the plant had ceased, an electric generating plant remained in operation and security patrolled the plant at irregular intervals.

The generating plant produced and transmitted electricity for the Homestead Works across the river. The electricity was transmitted through high voltage lines suspended on fabricated steel towers. Tower No. 13D, located in the western part of the plant, was of particular interest to Carter and his friends; it had open access to its base and a ladder that ascended the tower. The ladder began at ground level and extended upward 146 feet, affording entry to two platforms, one at the 112–foot level and the other at the 135–foot level.

On the evening of June 1, 1984, Carter and Stonebraker entered the plant again. Stonebraker, who had climbed tower 13D on a prior visit, taunted Carter with attacks on his courage until Carter followed Stonebraker up the tower.

* Judge Tamilia did not participate in the decision of this case.

After stopping briefly on the 112-foot platform, the pair climbed to the higher platform.

The platform at 135-feet had railing on two sides and was approximately fifteen feet by eight feet in size. Carter and Stonebraker decided to venture to the far edge of the platform on the side without a railing. To accomplish this, they had to duck under four grayish-colored insulated wires that draped to within four feet of the platform. Stonebraker maneuvered first and after passing under the first set of wires heard a crackling sound. He turned to see Carter receive a charge of electricity while his left hand touched one of the wires. Electric flashes discharged from Carter's hand, right shoulder, and left foot until he collapsed. Carter subsequently regained consciousness with some delirium. Stonebraker assisted him down the tower, through the plant and into a nearby field before going on for help.

As a result of the incident, Carter was hospitalized for several months and required numerous operations. His left hand, the small toe on his left foot, and part of his left forearm were amputated. Part of his right scapula was injured permanently, leaving scars.

On September 17, 1984, Carter's parents filed suit to recover damages on behalf of their minor son for the injuries he sustained and on behalf of Andrew Carter's father, Donald Carter, for the expenses incurred in effecting the recovery of his son. Trial by jury commenced on February 6, 1987, and on February 13, 1987 the jury returned a verdict in favor of Andrew Carter in the amount of one million five hundred thousand dollars ($1,500,000.00). Because the jury also found Andrew Carter twenty percent negligent, the verdict was molded appropriately to arrive at a one million two hundred thousand dollar ($1,200,000.00) award.

USX filed motions seeking judgment n.o.v. or, in the alternative, a new trial. The Honorable Richard G. Zeleznik denied USX's motion for judgment n.o.v., and granted it motion for a new trial on liability and damages. The Carters filed this timely appeal from the order granting

USX a new trial; USX cross-appealed from the order denying judgment n.o.v. We will address the Carters' issues in part I, and USX's cross-appeal with respect to the denial of judgment n.o.v. in part II.

## I.

The Carters raise the following issues on appeal:

1. After receipt of a jury verdict in a civil action, can the trial judge, with the assistance of defense counsel, properly question each juror as to his awareness of publicity, discussion of the publicity during deliberations, and its effect on the juror's decisions, and then award the defendant a new trial on the basis of the publicity, which accurately described the occurrence of a subsequent accident on defendant's premises, evidence of which was admissible?

2. Can a defendant which submits to a medial interview while a trial is in progress and openly discusses a subsequent accident which occurred on its premises later obtain a new trial on the basis of the resulting publicity about the subsequent accident?

3. Can a defendant obtain a new trial on the basis of allegedly prejudicial publicity even though it did not raise the issue during voir dire, did not inform the court of the publicity until after the jury had completed two hours of deliberations, and then elected to gamble on the verdict rather than request cautionary instructions?

Our standard of review from an order granting a new trial is, generally, whether the trial court clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case. *Stevenson v. General Motors Corporation*, 513 Pa. 411, 521 A.2d 413 (1987). However, where a trial court, in granting a motion for a new trial, gives a single reason for its decision, the validity of its legal justification for a new trial is at issue. Appellate review is then focused upon the legal adequacy of the reason given for the new trial. *Westinghouse Elevator*

*Company v. Herron,* 514 Pa. 252, 523 A.2d 723 (1987). In the case before us, the trial court granted USX's motion for a new trial based solely on the prejudicial effect that the February 12, 1987 newspaper and television reports had upon the jury. Consequently, our duty is to review the legal adequacy of Judge Zeleznik's reason supporting his order granting USX a new trial.

On the morning of February 13, 1987, while the jury was deliberating, the trial court was alerted to two media reports released on February 12, 1987 concerning an accident subsequent to the Carter incident where 16 year old Orlando Dudley was killed at the Carrie Furnace Works. At that point, counsel for USX requested that the jury be polled as to whether or not they had seen or heard of either the newspaper story or the television news report. Judge Zeleznik refused to interrupt jury deliberations at that time, opting to wait for the verdict. The jury then came in with a verdict awarding Carter $1.5 million dollars which was later molded to $1.2 million dollars, since the jury found Carter twenty percent negligent. After the verdict was read, Judge Zeleznik, along with counsel for the Carters and USX, questioned each juror individually in the judge's chambers. Judge Zeleznik asked each juror whether or not he or she was aware of either media report and whether the content of these reports changed their opinion regarding the outcome of the case.

While Judge Zeleznik's question as to whether or not a juror was *aware* of either of the media reports was permissible, his questions as to the *effect* of the reports on the jurors' deliberations were impermissible, therefore error on the part of the trial judge. Questions put to a juror regarding the process by which the verdict is reached are impermissible, as a juror may not impeach his own verdict by testifying about his thought process during deliberations. *See Commonwealth v. Carr,* 370 Pa.Super. 1, 535 A.2d 1120 (1987). After the inquiry revealed that jurors numbers four, eight, and ten had changed their opinion after seeing or hearing about the news report, USX filed a

motion for judgment n.o.v. or, in the alternative, a new trial. Judge Zeleznik denied judgment n.o.v., but granted a new trial in favor of USX, finding that the news report was extraneous information that had a prejudicial impact on the jury. Notwithstanding Judge Zeleznik's error in questioning the jurors regarding the effect of the media reports on their deliberations, the trial court's order granting a new trial will be affirmed.

We disagree with the view, as expressed in Judge Olszewski's Concurring and Dissenting Opinion, that the newscast did not constitute an extra-evidentiary prejudicial influence on the jury. Ignoring the testimony of the jurors as to the effect of the news report, it is clear that the jury's receipt of the evidence of the subsequent accident at Carrie Furnace Works was prejudicial.

Pennsylvania case law holds that accidents subsequent to the one in question may only be admitted for a limited purpose, for example, as evidence of a dangerous condition. *See, e.g., Yoffee v. Pennsylvania Power & Light Co.*, 385 Pa. 520, 123 A.2d 636 (1956) (evidence of a plane accident which occurred after the one that killed plaintiff's decedent was admissible to prove the dangerous condition of electrical wires strung across a river between two towers). *See also* Packel and Poulin, Pennsylvania Evidence, § 412.2 (West 1987). Assuming in the instant case that the evidence of the subsequent Dudley case would have been admissible, the evidence would have only been admissible for one purpose, to show the dangerous condition of USX's facility. When evidence is admissible for a limited purpose, the jury must be given a cautionary instruction limiting their use of the evidence if such an instruction is requested by the party against whom the evidence is being used:

[E]vidence which is admissible for one purpose or against one party is not rendered inadmissible because it is inadmissible for another purpose or against another party. When the general rule is followed and the evidence is admitted, there is a risk that the jury will consider the evidence for the inadmissible purpose. In view of this,

the opposing party is entitled to an instruction explaining to the jury the purpose for which the evidence may be considered and the purpose for which it may not be considered. The opposing party must request such an instruction.

Packel and Poulin, Pennsylvania Evidence, § 105 (West 1987) (footnotes omitted). *See also Bialek v. Pittsburgh Brewing Co.*, 430 Pa. 176, 185, 242 A.2d 231, 235 (1968); *Incollingo v. Ewing*, 444 Pa. 263, 294, 282 A.2d 206, 233 (1971). If the Carters had sought to admit evidence of the Dudley case at trial, and the court had allowed it to be admitted, USX would have been entitled to a jury instruction explaining the limited purpose for which this evidence could be considered by the jury in reaching their verdict.

Since the information concerning the Dudley case was made known to the jury outside of the evidence presented in the courtroom, the jury was left to consider this information without a proper limiting instruction. Left unqualified in the minds of the jury, evidence of the Dudley incident could have been considered by the jury in a manner prejudicial to USX. Because the jury received this information without benefit of any instruction, we find that the media reports were prejudicial and destroyed USX's chance for a fair trial.

■ The Carters also argue that the fact that a representative of USX openly discussed the subsequent accident with the media during the trial of this action should preclude it from obtaining a new trial based on publicity about the subsequent accident. We disagree with this argument. USX did not "educe[ ] the evidence to which [it] objects ..." *Ellsworth v. Lauth*, 311 Pa. 286, 290, 166 A. 855 (1933). USX did not contact the media; a newspaper reporter from the Post–Gazette contacted USX's Public Affairs Manager. Moreover, the trial judge stated that when the Carter trial was commencing, the newspaper reporter contacted the court and the court permitted her to read the complaint. In our opinion, the appellant has failed to show that USX in any way provoked this media coverage.

## II.

USX raises the following issue in its cross-appeal:

When a minor plaintiff has been injured while trespassing on defendant's electrical transmission tower and plaintiffs failed to establish at trial that defendant knew or had reason to know that children were likely to trespass there, failed to establish that defendant knew or had reason to know that a condition on its property involved an unreasonable risk to children, failed to establish that the minor plaintiff did not realize the risk involved, and failed to establish that defendant breached the duty of care normally owed a trespasser, is defendant entitled to a compulsory non-suit or judgment n.o.v.?

When reviewing the propriety of an order granting or denying judgment n.o.v., we must determine whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every reasonable inference that can reasonably be drawn from the evidence and rejecting all unfavorable testimony and inferences. *Mitzelfelt v. Kamrin*, 379 Pa.Super. 121, 125–126, 549 A.2d 935, 937–938 (1988). "Judgment n.o.v. may be granted only in a clear case where the facts are such that no two reasonable minds could fail to agree that the verdict was improper." *Id.*, 379 Pa.Superior Ct. at 126, 549 A.2d at 938, citing *Ingrassia Construction Co., Inc. v. Walsh*, 337 Pa.Super. 58, 61, 486 A.2d 478, 480 (1984). We submit that this is not a clear case, such that "no two reasonable persons could disagree that the verdict was improper." *McCloskey v. New York Life Insurance Co.*, 292 Pa.Super. 1, 436 A.2d 690 (1981). *See also Frank v. Peckich*, 257 Pa.Super. 561, 391 A.2d 624 (1978) (the rendering of a judgment n.o.v. is a drastic act and should be entered only when the facts are such that no two reasonable persons could fail to agree that the verdict was improper).

This action was based upon section 339 of the Restatement (Second) of Torts, which was adopted by our supreme court in *Bartleson v. Glen Alden Coal Co.*, 361 Pa. 519, 64

A.2d 846 (1949). Section 339 sets forth the prerequisites for successfully asserting a claim for injuries to children trespassing into highly dangerous artificial conditions as follows:

### § 339. Artificial Conditions Highly Dangerous to Trespassing Children

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise protect the children.

Restatement (Second) of Torts § 339.

▓ We find that there is sufficient evidence of record to support the verdict. First, it is reasonable to conclude that USX knew or had reason to know that children were likely to trespass at the plant. John Stasko, the general foreman for the Carrie Works on June 1, 1984, testified that numerous incidents of vandalism, including windows being broken, lockers overturned, and tools strewn about, had occurred prior to the incident in question. Moreover, Mr. Stasko testified that he found a dirt bike on the property the same day that Carter was injured. Additionally, the jury was presented with evidence that children had been seen on the property on numerous occasions and that USX

employees knew of the trial leading from the plant to the playing field and playground, located only one-third of a mile from the plant. In fact, Carter and Stonehouse admitted that they had been at Carrie Works on several other occasions. Finally, the tower did not have any warning signs and Carrie Works had not been used for a lengthy period of time prior to the accident. Therefore, it was reasonable for the jury to conclude that USX was aware that children were likely to trespass.

■■■ Second, we find that USX realized or should have realized that the Carrie Works, and specifically the tower, involved an unreasonable risk of serious bodily harm to trespassing children. While we agree with USX's assertion that the tower is located on private property and that the danger from high voltage wires was over one hundred feet in the air, our supreme court has stated that:

> There is no rule which requires that the dangerous condition must be on the ground or within reach of a minor. Such a distinction is artificial, without logic or experience to support it. What this distinction drives at is the question of whether or not a defendant shall be held reasonably to anticipate that a child will bring himself within the orbit of danger.

*Bartleson,* 361 Pa. at 528, 64 A.2d at 851.[1] In its brief, USX omits critical facts which were available to the jury.

There was testimony that a ladder led from the base of the tower directly to the tower platform high above the ground. The high voltage wires were easily within reach of any youth who had climbed up the tower; moreover, the

1. Contrary to USX's protestations, *Bartleson* is strikingly similar to this case. In *Bartleson,* an eleven year-old child was electrocuted on a high tension transmission tower. The tower was surrounded by a seven-foot high fence with two six-foot high gates. Children frequently played in the area. Well-worn paths passed close by the tower. Railroad tracks surrounded the area. One day, the gate to the tower was open. Several youths believed the power was shut off since the gate was open. They climbed up the tower on metal studs which protruded from the column. Eventually, one youth came into contact with live electrical wires. This court affirmed a jury verdict in favor of the plaintiff, based upon Section 339 of the Restatement (Second) of Torts.

tower was readily accessible to climbing by a child. Expert witnesses and USX employees testified that the tower was not enclosed by a fence or any type of barrier to prevent inquisitive children from climbing and encountering the perils of high voltage wires. Bearing in mind the jury's determination that USX was aware of the child trespassers, we find that the jury had sufficient evidence before it to conclude that the hazards posed to those children were unreasonable.

Third, USX avers that Andrew Carter realized the risk involved when he entered the Carrie Works and climbed the tower. To the contrary, the record reflects that Carter and Stonebraker testified that they believed the electricity had been shut off because the plant appeared to be abandoned. They visited the Carrie Works on other occasions prior to the day of the incident, climbing different structures in the area. Stonebraker had climbed tower 13D in the presence of Carter on at least one occasion. Neither youth saw signs warning of dangerous conditions on the tower, but they did admit to listening for buzzing noises to ascertain whether the voltage lines were active. USX emphasizes in its brief that Carter knew he was on private property, believed that tower 13D carried power to mills along the river, and knew that his parents would have forbidden him to go to the plant had they known of his intention to play at the Carrie Works. It is this precise type of behavior that is covered by Section 339 of the Restatement (Second) of Torts. An adult acting with reasonable rationality might very well conclude that the abovementioned considerations would weigh against climbing the tower. Unfortunately, Carter evaluated the situation from a child's perspective. He weighed the potential for harm against both the peer pressure applied by Stonebraker and the allure of climbing, ultimately reaching an unwise, naive conclusion, i.e., the tower was safe to climb.[2] The ability of Carter to fully appreciate the danger was a question for the

---

2. That children will accept an invitation to climb is matter of common knowledge. *Bartleson*, 361 Pa. at 529, 64 A.2d at 851.

jury, which found by its verdict that he did not fully comprehend the danger. *See Felger v. Duquesne Light Co.*, 441 Pa. 421, 273 A.2d 738 (1971); *Hyndman v. Pennsylvania Railroad Co.*, 396 Pa. 190, 152 A.2d 251 (1959).

Judge Cavanaugh states in his Dissenting Opinion that "Andrew was fully aware of the risk of falling from a height equivalent to a fourteen-story building. He knew it was dangerous to be where he was." (Dissenting Opinion by Cavanaugh, J., at p. 656). However, Carter's testimony is certainly sufficient to justify a jury's conclusion that he was not aware of the specific risk of electrocution on the date of the date of the accident. Moreover, the testimony to which Judge Cavanaugh refers reveals that Carter saw the "Danger, High Voltage" sign *prior* to June 1, 1984; Carter testified on direct examination that on that particular date, the date of the accident, there was no sign. (R.R. 218a–219a). Carter also testified that based on the appearance and condition of the plant, he was of the opinion that the plant was not operable and had been abandoned; he stated that equipment and tools were scattered and rusted, no lights were on at night, lockers were tipped over, and, in general, the appearance of the plant was "run down." (R.R. 196a–219a).

In our view, this evidence was sufficient to raise a question for the jury as to whether Carter fully appreciated the risk of electrocution. *See Bethay v. Philadelphia Housing Authority*, 271 Pa.Super. 366, 375, 413 A.2d 710, 714 (1979) ("The question of a child's appreciation of danger is ordinarily one for the jury and not the court"); *see also Trawick v. Nationwide Mutual Insurance Co.*, 242 Pa.Super. 271, 363 A.2d 1265 (1976) (judgment n.o.v. is improper where there is a question of fact for the jury; it may not be utilized so as to invade the province of the jury).

Fourth, USX does not address whether the burden of maintaining the tower and the burden of eliminating the danger were slight compared to the risk to child trespassers. Despite the absence of an argument from USX, we shall evaluate the evidence on this point. It seems that

USX was virtually unconcerned with the idle portion of the Carrie Works. When this section of the Carrie Works was operational, security were permanently posted at various locations around the facility. In May of 1984, one month prior to the Carter incident, the security was changed from permanently posted guards to roving patrols covering an admittedly large area. The number of security men was substantially reduced, requiring roving patrols of the area around the tower to be limited to a maximum of two per day. Also, one expert witness testified that the tower did not conform to the safety standards set forth in the American National Standards Institute Electrical Code. Further, the youths testified as follows: there were scant warnings posted in the area, no fences obstructed them from entering the plant, the ladder on the tower was very accessible to them, and they had trespassed without detection on other occasions. Clearly, sufficient evidence was introduced from which a jury could conclude that USX could have acted to prevent children from encountering such risks.

█ Fifth, USX fails to present an argument that it could not reasonably have eliminated the danger to the children. For the express reasons stated in our discussion on the previous issue, we concur with the jury that USX could have eliminated the danger by reasonable means.

█ Finally, USX asserts that the contributory negligence of Carter was greater than the causal negligence of USX. The jury apportioned twenty percent of the negligence in this case to Carter. The totality of causal negligence is a matter properly before the jury. *White by Stevens v. Southeastern Pennsylvania Transportation Authority*, 359 Pa.Super. 123, 137, 518 A.2d 810, 817, *alloc. denied*, 515 Pa. 609, 529 A.2d 1083 (1987). In reviewing a jury verdict on the apportionment of causal negligence, this court should be very reluctant to overturn the jury's decision. *Id.* After a thorough review of the evidence, discussed at length in this opinion, we find that the trial court has not abused its discretion nor that the jury rendered a verdict which shocks our sense of justice.

The trial court's order granting a new trial and denying judgment n.o.v. is affirmed.

BROSKY and BECK, JJ., concur.

CAVANAUGH, J., files a dissenting opinion in which POPOVICH, J., joins.

OLSZEWSKI, J., files a concurring and dissenting opinion in which McEWEN and JOHNSON, JJ., join.

CAVANAUGH, Justice, dissenting.

I respectfully dissent. I would enter judgment *non obstante veridicto* in favor of the United States Steel Corporation. The injuries in this case were not due to any legally inappropriate action or inaction on the part of United States Steel Corporation. The appellee, Andrew Carter, had the burden of proving by a fair preponderance of the evidence that United States Steel Corporation was negligent and that its negligence was the proximate cause of the accident. *Flagiello v. Crilly*, 409 Pa. 389, 187 A.2d 289 (1963). In my opinion, he has not carried this burden.

On June 1, 1984 at about 7:00 P.M., Andrew Carter, who was then fourteen years old and an eighth-grade student, entered the Carrie Furnace Works of the United States Steel Corporation. He was with his friend, Christian Stonebraker, who was also fourteen years old at the time. Andrew knew that the plant was private property but he and his friend and another boy, Charles Baker, had been there about six times before. Andrew thought that the plant was not in operation as there were no signs of activity. However, he knew it was a "dangerous place" and he did not tell his parents that he went there because they would not have wanted him to be there. There was a high electrical tower on the property approximately 145 feet in height near a cinder block building. Andrew was aware at that time that the building had a sign stating "Danger, High Voltage". The tower has two platforms, one at 112 feet and one at 135 feet from the ground. The one at 135 feet, where the accident occurred, was 15 feet × 8 feet and

had a railing on only two sides. The plaintiff ventured out to the far edge of the platform which had no railing.

Andrew had attempted to climb the tower before but he was afraid to do so because of the height. His friend, Christian, had called him "chicken" on prior occasions for not climbing the tower and on this occasion, he was persuaded to join Christian in ascending the tower. Andrew was aware that electricity was dangerous and accordingly, he was listening for "buzzing" sounds while climbing the tower since he believed that if electricity were going through the lines, he would hear such a sound. He would have climbed down had he heard a buzz.

Andrew and his friends had entered the premises on about a half dozen occasions since Christmas of 1983 until June 1, 1984. However, Andrew and Charles Baker had not climbed the tower. On the day on which the tragic accident occurred, Christian Stonebraker ascended the tower first with Andrew following. When the boys reached a platform near the top, Andrew touched a high voltage wire and as a result, was seriously injured.

In my opinion, there was not sufficient evidence to sustain the verdict against United States Steel Corporation and the court below erred in denying the motion for judgment *non obstante veredicto*. In reviewing the denial of a motion for judgment n.o.v., our sole duty is to decide whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every favorable inference reasonably to be drawn from such evidence. *Curran v. Philadelphia Newspapers, Inc.*, 376 Pa.Super. 508, 546 A.2d 639 (1988); *Curran v. Stradley, Ronon, Stevens & Young*, 361 Pa.Super. 17, 521 A.2d 451 (1987). In determining whether the evidence is sufficient to support the verdict, a reviewing court must consider all the evidence received. *Niles v. Fall Creek Hunting Club, Inc.*, 376 Pa.Super. 260, 545 A.2d 926 (1988). Judgment n.o.v. should be entered when the facts are such that no two reasonable persons could disagree that the verdict was improper. *McCloskey v. New York Life Insurance Compa-*

*ny,* 292 Pa.Super. 1, 436 A.2d 690 (1981); *Robertson v. Atlantic Richfield Petroleum Co.,* 371 Pa.Super. 49, 537 A.2d 814 (1987), appeal denied 520 Pa. 590, 551 A.2d 216 (1988).

The theory of the plaintiff's case was based on Restatement (Second) of Torts, § 339 which provides:

**§ 339.   Artificial Conditions Highly Dangerous to Trespassing Children**

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

Section 339 has been adopted as the law of this Commonwealth. *See Jesko v. Turk,* 421 Pa. 434, 219 A.2d 591 (1966). Nevertheless, the burden is on the trespassing child to prove that all of the conditions of § 339 are met. *Scarborough v. Lewis,* 359 Pa.Super. 57, 518 A.2d 563 (1986). The plaintiff below did not prove the conditions set forth in clauses (b) and (c). The comment to clause (b) states *inter alia:*

**i. When risk such that children can be expected to appreciate it.** The duty which the rule stated in this Section imposes upon the possessor of land is based upon the well-known tendency of children to trespass upon the land of others and the necessity of protecting them, even though trespassers, from their childish lack of attention and judgment. *The duty of the possessor, therefore, is only to exercise reasonable care to keep the part of the land upon which he should recognize the likelihood of children's trespassing free from those conditions which, though observable by adults, are likely not to be observed by children, or which contain the risks the full extent of which an adult would realize but which are beyond the imperfect realization of children. It does not extend to those conditions the existence of which is obvious even to children and the risk of which should be fully realized by them. This limitation of the possessor's liability to conditions dangerous to children, because of their inability to appreciate their surroundings or to realize the risk involved, frees the possessor of land from the liability to which he would otherwise be subjected by maintaining on the land the normal, necessary and usual implements which are essential to its normal use, but which reckless children can use to their harm in a spirit of bravado or to gratify some other childish desire and with as full a perception of the risks which they are running as though they were adults.*

.     .     .     .     .

j. *There are many dangers, such as* those of fire and water, or of *falling from a height, which under ordinary conditions may reasonably be expected to be fully understood and appreciated by any child of an age to be allowed at large. To such conditions the rule stated in this Section ordinarily has no application, in the absence of some other factor creating a special risk that the child will not avoid the danger,* such as the fact that the condition is so hidden as not to be readily visible, or a

distracting influence which makes it likely that the child will not discover or appreciate it.

*Where, however, the possessor knows that children too young to appreciate such dangers are likely to trespass on his land, he may still be subject to liability to such children under the rule stated.* (Emphasis added).

Andrew was fully aware of the risk of falling from a height equivalent to a fourteen-story building. He knew it was dangerous to be where he was.[1] He was also fully

1. Andrew Carter testified as follows:

Q. And am I correct that you went down there about the same number of times that Mr. Stonebraker did, five or six times, or did he go down there more than you did?
A. We never went down there without the other one, to the best of my recollection, and it would be about five to six times.
Q. I take it that you preferred not to tell your parents, because you knew they would object if you did?
A. Yes.
Q. *Why would they object?*
A. *Because they're parents. It's a dangerous place.*
Q. *It's a dangerous place, it's unsafe and they wouldn't want you down there.*
Isn't it true, Andrew, that your dad over the years has instructed you to stay out of unsafe areas?
A. Yes.
Q. Didn't he also tell you about electricity or advise you of its potential nature over the years?
A. Yes.
Q. And so you know better than to stick a fork into an electrical outlet in the house, certainly?
A. Yes.
Q. *And you know electricity is dangerous?*
A. *Yes.*

.    .    .    .    .

Q. You mentioned the size of the sign that was on the cinder block building, and you tried to compare it to the signs that were located on the other side of the cinder block building.
There's no question that you read that sign on that cinder block building, is there?
A. No.
Q. You saw that sign on that door?
A. Yes.
Q. Prior to June 1, 1984, didn't you?
A. Yes.
Q. *And that sign said, Danger, High Voltage; is that right?*
A. *Yes.*

aware of the risk involved if there had been electricity in the wires. He listened for a buzzing sound as he and his

Q. And I take it that that particular cinder block building was located immediately adjacent to the tower that you climbed; isn't that right?

A. Yes.

. . . .

Q. And as a matter of fact, you had attempted to climb that tower before, and you weren't able to do it; isn't that right?

A. Yes.

Q. And you didn't do it, because you were scared and afraid, and you didn't want to go up there and—strike that.

You didn't do it, because you got scared and backed down; isn't that right?

A. No. It was because of the heights, sir.

Q. So you know there was danger from the heights, there's no question about that?

A. Yes.

. . . .

Q. Isn't it true, Andrew, that on June 1, 1984, it was your understanding that if electricity was going into a line, it would make a buzzing noise?

A. Yes.

Q. And didn't you listen for buzzing noises when you went up that tower?

A. Yes.

Q. And isn't it also true, Andrew, that if you had heard buzzing noises, you would have come back down?

A. Yes.

Q. And the reason you would have come back down was because there would be electricity in that tower; isn't that right?

A. Yes.

Q. You didn't hear buzzing noises, even though you listened for them, and so you continued to climb; right?

A. Yes.

. . . .

Q. You never asked anybody whether the plant was shut down or not, did you?

A. How could I have asked anyone? Ask who?

Q. *You could have asked your father; isn't that right?*

A. *I could have, but why would I? That would only get me in some trouble.*

Q. So you didn't want to ask your father whether the plant was shut down, because you were afraid you were going to get into trouble, because he wouldn't want you down there in the first place; isn't that right?

A. *Well, no parent would.*

Q. You didn't ask any of your classmates if the plant was shut down, did you?

A. No.

(Emphasis added).

companion climbed the tower, and although he was tragically mistaken as to the presence of electricity in the wires, he was fully aware of the danger from live wires.

Andrew's father was an architect and had warned him to stay away from unsafe places. He knew of the danger involved in climbing to great heights and in electricity.

The requirements of Clause (c) were patently not met. The Restatement states in its comment to § 339:

Comment on Clause (c):

m. A possessor of land is, under the statement made in Comment e, under a duty to exercise reasonable care to keep so much of his land as he knows to be subject to the trespasses of young children, free from artificial conditions which involve an unreasonable risk of death or serious bodily harm to them. This does not require him to keep his land free from conditions which even young children are likely to observe and the full extent of the risk involved in which they are likely to realize. *The purpose of the duty is to protect children from dangers which they do not appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known and appreciated danger. Therefore, even though the condition is one which the possessor should realize to be such that young children are unlikely to realize the full extent of the danger of meddling with it or encountering it, the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved, but none the less chooses to encounter it out of recklessness or bravado.*

Illustration:

8. The A Railroad Company maintains upon its land an unlocked turntable, upon which, as it knows, children of the neighborhood frequently trespass, and which involves an unreasonable risk of harm to such children. On two occasions, B and C trespass upon the land, play with the turntable, and each is injured when his foot is caught in it. B is a boy sixteen years of age, whose maturity and

experience make him fully understand and appreciate the danger. C is a boy nine years of age, who is the son of a railroad engineer, has been repeatedly warned against the turntable, and likewise fully appreciates the danger. A Railroad is not liable to B or to C. (Emphasis added).

In the instant case, Andrew was subjected to pressure from his companion to climb the steel tower. Christian Stonebraker testified as to what occurred when he and Andrew arrived at the mill, as follows:

Q. Did you talk about climbing the electrical tower when you got down there?

A. Once we were inside the mill, yes.

Q. Who brought up the subject?

A. I don't recall.

Q. Did you say anything to Andrew about the safety of the tower?

A. Yeah. I told him it was really safe, everything was secure.

Q. Was it necessary to tell him that?

A. Because he inquired on whether it was safe or not.

Q. Why did you think it was safe?

A. Because I had climbed it before, and everything appeared strong.

Q. Now, when you said it was safe, were you alluding to the structure, or were you alluding to the condition of wires in the vicinity?

A. The structure itself.

Q. Did you have any concern about the wires on top of this tower?

A. No, sir.

Q. Why not?

A. I figured since the mill appeared abandoned, there would be no need for electricity. I thought the wires had just been shut off.

The appellee contends that the case is analogous to *Bartleson v. Glen Alden Coal Co.*, 361 Pa. 519, 64 A.2d 846

(1949), in which an eleven year-old boy climbed a high tension transmission tower to a height of 15 ft. while playing cowboys and indians and was electrocuted. The Supreme Court held that § 339 was applicable and affirmed the judgment for the plaintiff. The tower in that case was surrounded by a fence which was generally locked. The gate had been locked for years and children played in the area of the fence almost continuously over the years. On the date in question, some children, including the plaintiff, noticed that the gate was open and some of the boys thought the power was shut off because the gate was left wide open. The plaintiff did not know the tower was dangerous. The Supreme Court pointed out that there were three well-worn paths close by the tower which were frequently used by people in the neighborhood in going to school, church and work. This contrasts with the situation in our own case where the mill site was about three-quarters of a mile from a playground and access was available only along railroad tracks as the rest of the mill was fenced in. In addition, the plaintiff in *Bartleson* only climbed to a height of 15 feet, which is substantially different from climbing a tower that is approximately 145 feet in height.

In *Jennings v. Glen Alden Coal Co.*, 369 Pa. 532, 87 A.2d 206 (1952) the Supreme Court held that the court below properly entered a non-suit against the plaintiff whose cause of action was based on § 339. In that case, a thirteen year-old boy went swimming in a pool on an abandoned strip mine containing water of a depth of 25 feet. The area was wild and uncultivated and the pool was about a half-mile from the highway. On two previous occasions, boys went swimming and people occasionally hunted and picked berries on the site. The Supreme Court held that this did not prove that the defendant knew, or had reason to know of the trespassers. The court further noted at 369 Pa. at 536, 87 A.2d at 208:

It certainly cannot be said that a normal boy thirteen and one-half years of age who has been in and around

water often enough to have learned how to swim does not realize the risk involved in swimming in deep water.

In *Felger v. Duquesne Light Co.*, 118 P.L.J. 79 (1970), affirmed; 441 Pa. 421, 273 A.2d 738 (1971), the plaintiff was a fourteen year-old boy who climbed a pole containing electric wires and was seriously injured when he touched the wire. A parking lot where the pole was located had been used for many years as a playground for children. The plaintiff had received no warning about the dangers of electricity or climbing telephone poles. He reached the pole by climbing onto a 3 foot high wall and then climbed the pole. A verdict was entered for the plaintiff and the court entered judgment n.o.v. as all of the conditions of § 339 had not been satisfied. The case is clearly analogous to our own and readily distinguishable from *Hyndman v. Pennsylvania Railroad Co.*, 396 Pa. 190, 152 A.2d 251 (1959). In *Hyndman*, a boy scout troop occupied a campsite about 25 feet from a railroad right of way. The camp was located only 50 feet from a catenary pole containing live wires. The boy scout camp was frequented for a long period of time before the accident and boys often climbed the pole to a platform 20 feet above the ground. The plaintiff was an eleven year-old boy and unaware of the danger involved, climbed to the platform. He touched the wires and was severely burned. He was also knocked from the platform to the ground. Judgment for the plaintiff was affirmed by the Supreme Court on the grounds that the conditions of § 339 had been met. The Supreme Court also noted that after the accident the defendant attached signs to the tower reading "Danger, Live Wire, Keep Off."

In the case before us, the imposition of liability on United States Steel would make the defendant an insurer. The plaintiff was a fourteen year-old boy who was fully aware of the risks involved in climbing a 145 feet high electrical tower, both as to the danger involved in climbing to such a height and the risk if electricity was present in the wires. He was aware of the sign stating "Danger, High Voltage" located on a cinder block building immediately adjacent to

the tower that he climbed.[2] The plaintiff was induced to climb the tower by his companion, who previously said he was "chicken" for not attempting this. The evidence was not sufficient to sustain a verdict for the plaintiff. The mere happening of an accident does not raise an inference or presumption of negligence, nor even make out a prima facie case of negligence. *Churilla v. Barner*, 269 Pa.Super. 100, 409 A.2d 83 (1979). Imposition of liability under Section 339 requires proof of negligence. *Scarborough v. Lewis*, 359 Pa.Super. 57, 518 A.2d 563 (1986). While we are sensitive to the very serious injuries suffered by the plaintiff, we should not allow this to permit imposition of liability upon a defendant where none exists under the law.

I would reverse and grant judgment *non obstante veredicto*.

Having reviewed the Opinion of Cirillo, P.J. with my conclusion as to the grant of judgment n.o.v., I adhere to the opinion that the grant of judgment n.o.v. is the appropriate disposition of this case. Nevertheless, if I were to reach the issue of the propriety of the newspaper and television reports, I would grant a new trial because of the prejudicial nature of the reports.

POPOVICH, J., joins.

OLSZEWSKI, Justice, concurring and dissenting.

We, too, would affirm the trial court's order denying judgment n.o.v.; however, we cannot join the majority's decision to affirm the trial court's order granting a new trial in favor of the United States Steel Corporation (USX) on any grounds.

The Carters assert that we should reverse the trial court granting new trial on grounds of prejudicial publicity. We believe that the prejudicial publicity did not constitute an

---

**2.** The majority opinion states at p. 652, "Finally, the tower did not have any warning signs ..." The plaintiff himself testified that there was a warning sign of which he was aware located on a building immediately adjacent to the tower.

extra-evidentiary prejudicial influence sufficient to justify a new trial; accordingly, we would reverse.

Initially, we note that the learned trial judge, apparently in accordance with standard practice in Allegheny County, recessed the jurors for the evening promptly at 5 p.m., even though they had not yet reached a verdict. We believe that the better practice in such cases is to keep the jurors at the courthouse later, allowing a break for dinner if necessary, until it becomes apparent that the jurors cannot reach a verdict by a reasonable hour. Naturally, jurors should not be coerced into reaching a quick verdict by the threat of a late night at the courthouse; however, trial courts should try to avoid giving jurors any opportunity to be exposed to information not presented in the evidence. When there is a risk that the jury will be exposed to information not in evidence, the trial judge should consider sequestering the jury. If such a practice had been followed in the present case, we might not be faced with this difficult decision. We now turn to the merits of this appeal.

### I. New Trial on Grounds of Prejudicial Publicity

The majority treats the media accounts in this case as if they had been offered into evidence without proper instructions. Opinion at 650–651. We do not agree with their means of analysis, nor with the result it achieves. We emphasize that these accounts were not evidence. The second incident at Carrie Furnace Works was never offered into evidence nor admitted. No testimony regarding the second event was ever elicited at trial. The majority uses an inapposite analysis in order to look into the deliberations of the jury.

As the majority points out, jurors may not impeach their own verdicts. Opinion at 650. The well-settled policy of this Commonwealth protects the inviolability of jury deliberations. *Commonwealth v. Williams*, 514 Pa. 62, 76, 522 A.2d 1058, 1065 (1987), *quoting Cluggage v. Swan*, 4 Binney 150 (1811).

[T]he verdict as uttered is the sole embodiment of the jury's act and must stand as such without regard to the motives or beliefs which have led up to its act. The policy which requires this is the same which forbids a consideration of the negotiations of parties to a contract leading up to the final terms as deliberately embodied in their deed, namely, the loss of all certainty in the verdict, the impracticability of seeking for definiteness in the preliminary views, the risk of misrepresentation after disclosure of the verdict, and the impossibility of expecting any end to trials if the grounds for the verdict were allowed to effect its overthrow.

8 *Wigmore on Evidence*, § 2349, rule (a).

To this end, as a general rule, once the jury is polled and the verdict is recorded, the process by which the verdict is reached is not subject to impeachment by the jurors. *Commonwealth v. Carr (1987)*, 370 Pa.Super. 1, 13, 535 A.2d 1120, 1126 (1987), *citing Commonwealth v. Fowler*, 362 Pa.Super. 81, 523 A.2d 784 (1987); *see also Commonwealth v. Stark*, 363 Pa.Super. 356, 526 A.2d 383 (1986). A juror is, therefore, incompetent to testify as to what occurred during deliberations in the jury room. *Fink v. Commonwealth*, 85 Pa.Cmwlth. 290, 293, 482 A.2d 281, 284 (1984), *citing Pittsburgh National Bank v. Mutual Life Insurance Company*, 493 Pa. 96, 425 A.2d 383 (1981); *see also Commonwealth v. Pierce*, 453 Pa. 319, 322, 309 A.2d 371, 372 (1973), *quoting Friedman v. Ralph Brothers, Inc.*, 314 Pa. 247, 249, 171 A. 900, 901 (1934).

A narrow exception to this general rule permits a juror to testify post-trial as to the existence of outside influences that may have prejudiced the deliberations. *Williams, supra*, 514 Pa. at 79, 522 A.2d at 1066, *citing Commonwealth v. Sero*, 478 Pa. 440, 445, 387 A.2d 63, 67 (1978); *Commonwealth v. Zlatovich*, 440 Pa. 388, 269 A.2d 469 (1970); *Welshire v. Bruaw et al.*, 331 Pa. 392, 200 A. 67 (1938); *see also Commonwealth v. Fuller*, 336 Pa.Super. 507, 508, 485 A.2d 1197, 1198 (1984). This exception developed upon the recognition by our Supreme Court that "we can maintain

the viability of the jury as a judicial decision-making body only by guaranteeing that a verdict is reached by evidence and argument in open court, not by outside influences that might strip the jury of the impartiality we demand." *Sero, supra,* 478 Pa. at 445, 387 A.2d at 67.

To effectuate this exception to the rule, a juror may testify as to the nature of the outside influence but is incompetent to testify as to the effect that this influence may have had in reaching a decision.

> The ABA Standards pertaining to Trial by Jury, at § 5.7(a), direct that "[u]pon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined." This is consistent with the well-settled principle of public policy in this Commonwealth that "post-trial affidavits and evidence of jurors elicited by the examination of counsel or by a litigant for the purpose of ... impeaching the verdict are improper, and such practice is to be discouraged." 38 P.L.E. Trial § 397. See: *Commonwealth v. Pierce,* 453 Pa. 319, 309 A.2d 371 (1973). "Little will be gained and much lost by such inquiries." [*Zlatovich, supra,* 440 Pa. at 396, 269 A.2d 473].

*Fowler, supra,* 362 Pa.Super. at 85, 523 A.2d at 786–787.

This exception to the virtual inviolability of jury verdicts is applied only in very limited and compelling circumstances. *Williams, supra* (death sentence cannot stand where jurors were informed that appellant was wanted in two other states on murder charges); *Commonwealth v. Santiago,* 456 Pa. 265, 268, 318 A.2d 737 (1974) (a new trial warranted where alternate juror informed that defendant had killed others in addition to the victim in the case); *Welshire v. Bruaw,* 331 Pa. 392, 200 A. 67 (1938) (inherently coercive effect of tipstaff's conduct in pressuring jurors to reach a prompt decision on jury's deliberations warranted a new trial); *but cf. Commonwealth v. Syre,* 513 Pa. 1, 518 A.2d 535 (1986), *overruling* 348 Pa.Super. 110, 501 A.2d 671

(1985) (alternate juror's testimony that court crier had advised one juror that every person who asks for jury trial is guilty not prejudicial given juror's denial of such conversation); *Fowler, supra* (jurors viewing television program dealing with rape between days of deliberating not prejudicial even though one juror testified that "he could not be certain" that program had not affected his deliberations); *Sero, supra* (information conveyed to jurors that defendant had begun to read Bible after wife's death does not create potential for prejudice).

Instantly, the trial court determined that extraneous information had come to the jury's attention and that, as a consequence, "... it became necessary to determine whether that information itself was prejudicial." Opinion at 13. In making this determination, however, the learned trial judge improperly questioned the jurors as to the effect of the television broadcast on their deliberations. The trial court determined that the extra-evidentiary information was prejudicial because it "raises an immediate adverse inference as to defendant's contempt for the lives of trespassing children...." Opinion at 14.

The learned trial judge erred when he invaded the privacy of the jury room and questioned the jurors as to the effect of the extra-evidentiary influences. "It [is] improper for the trial court ... to interrogate an individual juror regarding the mental processes by which he had reasoned and then permit the juror to be cross-examined by defense counsel." *Fowler, supra,* 362 Pa.Super. at 85, 523 A.2d at 787.

In any event, we believe that the prejudicial effect of the article and news broadcast was not of such a magnitude as to permit the impeachment of the jury's verdict. We do not find any of the compelling circumstances present in the instant case nor do we believe we should carve such an exception to the rule prohibiting impeachment of a jury verdict. We do not find the newscast to be an extra-evidentiary prejudicial influence as contemplated by the law of this Commonwealth. It is a well-established principle of public policy that post-trial testimony by jurors for the

purpose of "impeaching the verdict is improper, and such practice is to be discouraged." *Fowler, supra,* at 85, 523 A.2d at 787, *quoting* 38 P.L.E. Trial § 397.

Furthermore, we do not believe that a new trial should be granted because we believe USX was partially responsible for the situation it complains of. On the morning of February 13, 1987, USX's counsel asked the court to poll the jury to learn whether anyone had seen the media accounts of the second incident at Carrie Furnace Works.[1] The trial court chose not to poll the jury at that time, and opined, "Maybe no one read [the media accounts] at all. Maybe you will get a defense verdict, then it becomes moot." At that time, USX's counsel withdrew its motion. Transcript, 2/13/87, at 15. USX acquiesced to the court's decision not to poll the jury until after the verdict was received. "A party may not sit by silent, taking his chances on a verdict, and, if it is adverse then complain of matters which, if error, could have been eradicated during the trial if brought to the court's attention properly and timely." *Krywucki v. Trommer,* 199 Pa.Super. 145, 155, 184 A.2d 389, 394 (1962), *citing Segriff v. Johnston,* 402 Pa. 109, 166 A.2d 496 (1960).

In the present case, the issue was brought to the court's attention; however, USX withdrew its motion and took the chance that, as the court suggested, the jury might come back with a defense verdict. Having taken that chance, the defense cannot now complain.

## II. USX's Alternative Grounds For Granting A New Trial

USX presented two alternative grounds for granting a new trial. These alternative grounds were not addressed

---

1. We believe the course of action suggested by USX's counsel is the better practice. In cases like this one, where prejudicial matter is published while the jury is deliberating, a trial court should poll the jury to see if any of them have been exposed to the publicity. If they have, the judge and counsel for both sides should see the affected jurors in chambers, to establish whether those jurors can remain fair and impartial and base their verdict solely on evidence presented in court. If the affected jurors cannot do so, then a mistrial should be declared. If they can be fair and impartial, then the court should instruct them not to discuss the publicity with their fellow jurors.

by the majority or by the trial court because they would grant new trial on grounds of prejudicial publicity. We do not believe either of these alternative grounds justify a new trial.

First, USX asserts that the trial judge improperly exercised his discretion in permitting the jury to view the involved premises. The record reflects that, on February 6, 1987, the jury was taken to view the Carrie Furnace Works. Our Pennsylvania Rules of Civil Procedure provide that a party may apply for a jury view of any premises involved in the litigation. Pa.R.C.P. 219. "[T]he allowance of the application shall be within the discretion of the court...." *Id.* The purpose of a view is to better enable the jurors to understand the testimony and to assist them in weighing conflicting testimony. *Lobozzo v. Adam Eidemiller,* 437 Pa. 360, 366, 263 A.2d 432, 435 (1970) (citations omitted). A trial court should not grant a view if the condition of the premises has changed substantially between the date of the accident and the time of trial. *Garris v. McClain,* 399 Pa. 261, 160 A.2d 398 (1960); *Frasso v. City of Reading,* 244 Pa. 525, 90 A. 800 (1914). A trial court might also deny a request for a jury view because the season of the year might not adequately portray the premises at the time of the accident. *Diehm v. New Holland,* 126 Pa.Super. 315, 191 A. 393 (1937).

USX urges that Carrie Works had substantially changed since the date of the accident. In support of this contention, USX cites testimony establishing that the railroad tracks and cars had been removed, the electrical wires running to tower 13D had been cut by vandals, the view occurred in February when there was no vegetation on the path, and the jury had to pass by a Duquesne Light substation, surrounded by fences and barbed wire, on the way to the view. USX's brief at 29–30. While these facts demonstrate that, on the date of the accident, some conditions were slightly different from conditions on the date of the

jury view, the facts are not sufficient to establish substantially changed conditions at the Carrie Works.

The purpose of the view was three-fold: (1) to enable the jury to depict the proximity of the playing field and playground to the Carrie Works; (2) to show the route taken by Carter to gain access to the Carrie Works; and (3) to show the height and structure of the tower. Andrew Carter testified that the conditions at Carrie Works had actually improved since June 1, 1984. The boy indicated that several holes in the fence around the perimeter of the facility had been patched, the wires atop the tower had been removed, and the general condition of the buildings was cleaner. Carter further testified that the property, including the tower, was substantially unchanged since the accident.

As a safeguard against the jury placing too much emphasis upon the view, the trial judge stated to the jury, in pertinent part:

> I omitted one instruction completely and that would be this: The purpose of your trip to a view of the Carrie Furnace Works and Tower 13–D was to enable you to understand the testimony which was or would be introduced.
>
> Conditions which you observed there in 1987 are not substantive evidence of the way the facilities appeared on June 1, 1984, the day of this accident.
>
> You should consider the testimony and the other evidence, such as pictures, on the conditions as they did exist on June 1, 1984.
>
> There are some and were some differences. Of course, the tower never changed, and the buildings didn't change, but there were some tracks that weren't there. Perhaps other things you might have notices.

Notes of Testimony, pages 718–719. The instruction was very helpful in limiting any prejudice which could result from the view. Accordingly, after consideration of the condition of the premises, the instruction to the jury, and the purpose of the view, we would find that the trial court

did not abuse its discretion in permitting the jury to view the scene of the accident.

USX's next allegation not adjudicated by the trial court is that the trial court erred when it failed to grant a continuance of the trial. The trial court is vested with broad discretion in the determination of whether to grant a continuance, and, an appellate court should not disturb the decision absent an abuse of discretion. *Pierce v. Penman,* 357 Pa.Super. 225, 230, 515 A.2d 948, 950 (1986), *alloc. dn.,* 515 Pa. 608, 529 A.2d 1082 (1987). "We must carefully scrutinize with extra care the lower court's action in denying a continuance when such action operates to deprive a litigant of his chosen counsel." *Walasavage v. Marinelli,* 334 Pa.Super. 396, 413, 483 A.2d 509, 518 (1984). USX claims that it was prejudiced when a member of its in-house counsel staff was hospitalized prior to trial, and rendered unable to participate in the trial.[2] We believe the claim has no merit.

Rule 216 of the Pennsylvania Rules of Civil Procedure permits the trial court to grant a continuance to "counsel of record" in case of illness. The attorney who was hospitalized handled a great portion of the pre-trial litigation, but she was not counsel of record nor did she handle the case to the exclusion of all other in-house counsel. Further, the attorney was hospitalized on January 5, 1987, and was unable to return to work, on doctor's orders, for another six weeks. A continuance was granted until February of 1987. Counsel for USX had approximately one month to complete the preparations for trial.[3] USX had the option to try the

---

**2.** USX cites the rationale expressed in *Budget Laundry Company v. Munter,* 450 Pa. 13, 298 A.2d 55 (1972), as authority for the proposition that a continuance should have been granted. The case is inapposite to the instant matter. In *Budget Laundry Company,* the defendant was *unrepresented* by counsel at trial, due to counsel appearing in Federal Court at the same time as Munter's trial. Here, USX was represented by distinguished counsel at all stages of the Carter lawsuit.

**3.** As of January 5, 1987, discovery was virtually complete and USX's pre-trial statement had already been filed with the trial court.

case with other in-house counsel, or retain outside counsel. On the very same day that the continuance was granted, the well-prepared files were delivered to the offices of the retained counsel. They had adequate time to familiarize themselves thoroughly with the case and present an effective, competent defense. As a result, we do not believe the trial court abused its discretion when it granted the continuance until February 2, 1987.[4]

USX alleges, as its final basis for the granting of a new trial, that the trial court erred in permitting Karen Roche, M.D., to speculate as to Andrew Carter's future physical condition. In her report filed with plaintiff's pre-trial statement, Dr. Roche opined that Andrew could develop cataracts and/or neurological degeneration in the future. USX provides us with three cases purportedly in support of its position. None of the cases is dispositive of this issue.

In *Martin v. Johns–Manville Corporation*, 508 Pa. 154, 494 A.2d 1088 (1985), the trial court permitted a medical expert to testify that plaintiff's one blood-spitting episode coupled with his exposure to asbestos, demonstrated a greatly increased risk of contracting cancer. The Pennsylvania Supreme Court held that the trial court had erred when it admitted the testimony for the purpose of demonstrating a greatly increased risk of cancer. In *Lorch v. Eglin*, 369 Pa. 314, 85 A.2d 841 (1952), the plaintiff was injured in an automobile accident. The medical expert witness testified that it was "possible," not reasonably probable, for another illness to develop as a result of his injuries. Once again, the Supreme Court reversed because the evidence was too speculative. In *Baccare v. Mennella*, 246 Pa.Super. 53, 369 A.2d 806 (1976), the plaintiff had experienced lower back pain as a result of injuries sustained

---

4. The trial court would have encountered scheduling difficulties if a longer continuance had been granted. The trial court had the option to insert the case into the March schedule, possible bumping the adjudication of another case into the fall term, or scheduling the trial for the fall.

in an automobile collision. An expert medical witness testified that he was unable to give any prognosis concerning future back pain, or to estimate future medical expenses. This Court affirmed the trial court's conclusion that it could not instruct the jury on future medical expenses when the testimony was so speculative.

A plaintiff in a personal injury suit may introduce expert testimony to support a claim that he may suffer certain future harm as a result of a past injury. *Martin v. Johns-Manville, supra* 508 Pa. at 164, 494 A.2d 1093; *Boyle v. Pennsylvania Railroad Company,* 403 Pa. 614, 618, 170 A.2d 865, 867 (1961); *Walsh v. Brody,* 220 Pa.Super. 293, 296, 286 A.2d 666, 668 (1971). When making prognosis, a medical expert cannot be expected to express his or her opinion with the same medical certainty required in a causation question. *Boyle v. Pennsylvania R.R., supra, citing Stevenson v. Pennsylvania Sports Enterprises, Inc.,* 372 Pa. 157, 165, 93 A.2d 236, 240 (1952); *see Gradel v. Inouye,* 491 Pa. 534, 421 A.2d 674 (1980). Unlike the plaintiffs in *Martin* and *Lorch,* whose medical experts testified that the illness from which the plaintiffs suffered might possible lead to other separate illness, Carter was already diagnosed as suffering from neurological degeneration. Dr. Roche stated with reasonable medical probability that neurological degeneration was secondary to severe electrical burns. USX did not pursue this issue on cross-examination, or present expert testimony to rebut the opinion of Dr. Roche. Therefore, we would find that the trial court did not abuse its discretion by permitting the testimony.

We would affirm the portion of the order of the trial court denying USX's motion for judgment n.o.v. and reverse the portion of the order of the trial court granting a new trial to USX.

McEWEN and JOHNSON, JJ., join.